Elizabeth WILSON, individually and as Mother and next friend of Ailsa DeBold, Plaintiff, Appellant,

v.

BRADLEES OF NEW ENGLAND, INC., et al., Defendants, Appellees.

No. 95–2293.

United States Court of Appeals, First Circuit.

Heard April 3, 1996.

Decided Sept. 25, 1996.

Edwin Paul Gale with whom Thomas Craig, P.A. was on brief, Manchester, NH, for appellant.

E. Donald Dufresne with whom Alexander J. Walker, Jr., Devine, Millimet & Branch, P.A., Michael J. Goldman, Freeman & Hawkins, Michael S. Owen and Wiggin & Nourie, P.A. were on briefs, Manchester, NH, for appellees Union Underwear Company, Inc., Sharky's Sportswear Co. and Paradise Screen Printing Co.

Before TORRUELLA, Chief Judge, CYR and BOUDIN, Circuit Judges.

BOUDIN, Circuit Judge.

Ailsa DeBold suffered severe burns after her sweatshirt and T-shirt caught fire. Her mother, Elizabeth Wilson, brought suit for damages—on behalf of Ailsa and Elizabeth—against Union Underwear, Inc., the manufacturer of the garments, Sharkey's Sportswear, Inc., the wholesaler, Paradise Screen Printing, the printer of the garments' logos, and Bradlees of New England, Inc., the retailer. After initially refusing to do so, the district court eventually granted summary judgment for all defendants, on the ground that the Flammable Fabrics Act, 15 U.S.C. § 1191, *et seq.*, preempted Wilson's common-law claims. Believing that under current conditions the statute does not preempt Wilson's common-law claims, we reverse.

The complaint, which we take as true, *Snow v. Harnischfeger Corp.*, 12 F.3d 1154, 1157 (1st Cir.1993), *cert. denied,* — U.S. —, 115 S.Ct. 56, 130 L.Ed.2d 15 (1994), alleged the following. On February 15, 1991, Ailsa DeBold, who was 12 years old at the time, reached across a stove to turn off a whistling kettle; her sweatshirt and T-shirt ignited, and she suffered second and third degree burns over her torso and abdomen. Both of the garments were made of a 50/50 blend of cotton and polyester; it is agreed that the fabric complied with the applicable federal flammability standard, known as Commercial Standard ("CS") 191–53. 16 C.F.R. part 1610.

Wilson's suit was based on four theories: strict liability, negligence, failure to warn, and breach of implied warranty. Defendants moved for summary judgment, arguing that Wilson's claims were preempted by the Flammable Fabrics Act. The district court initially denied the motion, but on motion for reconsideration reversed itself. The district court held that all of Wilson's claims were expressly preempted by section 1203(a) of the Flammable Fabrics Act, 15 U.S.C. § 1203(a), which provides:

Except as provided in subsections (b) and (c) of this section, whenever a flammability standard or other regulation for a fabric, related material, or product is in effect under this chapter, no State or political subdivision of a State may establish or continue in effect a flammability standard or other regulation for such fabric, related material, or product if the standard or other regulation is designed to protect against the same risk of occurrence of fire with respect to which the standard or other regulation under this chapter is in effect unless the State or political subdivision standard or other regulation is identical to the Federal standard or other regulation.

Quoting *Cipollone v. Liggett Group*, 505 U.S. 504, 521, 112 S.Ct. 2608, 2620, 120 L.Ed.2d 407 (1992), the district court held that the phrase "flammability standard or other regulation" should be read to "sweep[ ] broadly and suggests no distinction between positive enactments and common law." All of Wilson's claims based on the garments'

defective nature—strict liability, negligence, and breach of implied warranty—hinged on the allegation that the garments failed to meet some standard of performance. The district court reasoned that these claims would, if successful, establish a "flammability standard" different from the federal standard—CS 191–53—which the fabric admittedly met.

Wilson's remaining claim nominally did not rest on the defective nature of the garments but rather upon a failure to warn of the danger presented. Still, the district court held that imposition of a common-law duty to warn would "give rise to state law regulation or duty 'designed to protect against the same risk' of fire-related injuries protected by the performance-based standards" of federal law. Accordingly, the court granted summary judgment for the defendants on all claims. Wilson appealed. We review the legal issue presented *de novo. Brown v. Hearst Corp.,* 54 F.3d 21, 24 (1st Cir.1995).

*Statutory coverage of common-law torts.* Where Congress has adopted a specific preemption provision, our initial concern is with express preemption and with the reach of the clause in question. *Cipollone,* 505 U.S. at 517, 112 S.Ct. at 2617–18. Here, the defendants point to section 1203(a), quoted in full above, which says that a state may not "establish or continue in effect a flammability standard or other regulation" if it is designed to protect against the same risk of occurrence of fire as the federal standard or other regulation. There are statutory exceptions, *e.g.,* 15 U.S.C. § 1203(b), but they admittedly do not apply here.

Wilson's claims do appear to address the same risk as the federal flammability standard insofar as those claims assert that the clothing in question should have been made or designed to be less flammable. (Wilson's failure to warn claims are, at least in part, a different matter which we reserve for later discussion.) But Wilson says that section 1203(a) was meant to preempt only positive state law (*e.g.,* a state statute or administrative regulation) and not a judge or jury determination made in a common-law tort action.

To us, the language of section 1203(a) does not dictate the answer to the question thus posed; indeed, there is no indication that Congress, in adopting section 1203(a), ever considered the question. But courts are often asked to resolve statutory issues where the legislature had no specific intent on the precise point at issue. Language, precedent and policy remain pertinent—more to provide a reasonable solution than to discover a largely fictional legislative intent. *See Versyss, Inc. v. Coopers and Lybrand,* 982 F.2d 653, 654 (1st Cir.1992), *cert. denied,* 508 U.S. 974, 113 S.Ct. 2965, 125 L.Ed.2d 665 (1993).

To start with statutory language, the phrase "standard or other regulation" does suggest that Congress was speaking of positive law. The term "standard" could be used to refer either to a statute or a common-law decision, but "regulation" is a term peculiar to positive law; and to refer to "standard or other regulation" arguably implies that Congress was addressing those standards that are contained in statutes or administrative directives. The further reference to "State or political subdivision" may slightly reinforce the inference that Congress was referring to something adopted by a state legislature or local entity.[1]

On the other hand, the Supreme Court has now read the term "requirement," in the counterpart preemption provision of the Medical Device Amendments of 1976, 21 U.S.C. § 360k(a), to embrace common-law rules. *Medtronic, Inc. v. Lohr,* —— U.S. ——, —— ——, 116 S.Ct. 2240, 2259–60, 135 L.Ed.2d 700 (Breyer, J., concurring), 2262–63 (four Justices concurring in part) (1996). Linguistically, this is a slightly easier stretch—simply because the phrase "or other regulation" does not appear in the *Lohr* statute. But one could argue that the two statutes are so close in structure that they should be read in the same fashion, a view that finds a trace of support in the

---

**1.** This implication is also supported by the wording of another provision of the Flammable Fabrics Act, whereby Congress prohibits the manufacture or sale of any material that does not conform to "an applicable standard or regulation" issued pursuant to the statute—an unambiguous reference to positive law. 15 U.S.C. 1192(a).

legislative history cited below. In short, section 1203(a) could be read either way.

Legislative history is the usual next resort where language is not conclusive. The Flammable Fabrics Act has a complicated history with two different strands, one concerning substantive changes in the law and the other related to successive preemption provisions. Substantively, the original statute is a curiosity. Faced in 1953 with episodes of burning clothing, Congress did not enact the usual full fledged regulatory statute giving an agency administrative oversight. Instead, it enacted, as positive law, the then existing *industry*-developed standard fixing a minimum resistance-to-flammability level. 67 Stat. 112.[2]

The 1953 version of the statute made it unlawful to make or sell fabric or clothing that failed the CS 191–53 standard, and it gave the Federal Trade Commission power to enforce the standard. 67 Stat. 112–13. In addition, the statute required the Secretary of Commerce to submit a report and legislative proposals if he found that CS 191–53 was "inadequate" to protect the public. *Id.* at 112. No preemption language was contained in the original statute.

In 1967, Congress amended the statute to give the Commerce Department authority to issue its own flammability standards and other regulations, including labeling requirements. 81 Stat. 568, 569. Pending adoption of such new federal standards, a savings clause in the amendments continued CS 191–53 in force. *Id.* at 574. The savings clause is not codified but remains in force today. *See* 15 U.S.C. § 1191 (note captioned "Savings Provision" following section).

In 1968 the Secretary of Commerce began a rulemaking proceeding, based on a preliminary finding that the existing standards were inadequate. 33 Fed.Reg. 15,662. No new federal flammability standards have ever been adopted, and CS 191–53 continues to be the federal standard. It has been included in the Code of Federal Regulations to reflect the existence of the savings clause. *See* 16 C.F.R. part 1610, codification note.

The 1967 amendments included a preemption provision stating that the Flammable Fabrics Act "supercede[d] any law of any State or political subdivision thereof inconsistent with its provisions." 81 Stat. 574. Such language did not clearly prohibit states from imposing higher standards, at least in the course of common-law tort actions. In one of the few appellate decisions on this issue, this court held in *Raymond v. Riegel Textile Corp.*, 484 F.2d 1025 (1st Cir.1973), that a common-law tort claim of this kind was not preempted by the 1967 language. *Id.* at 1027.

By the time Congress enacted the present version of the Flammable Fabrics Act in 1976, 90 Stat. 512, it had already transferred (in 1972) the power to adopt flammability standards and other regulations, and to enforce the statute, to the Consumer Product Safety Commission ("CPSC"). 86 Stat. 1231. The 1976 amendments replaced the 1967 preemption language with the above-quoted provision of section 1203(a). The amendments also expressly provided that a state could establish or continue in effect more stringent standards or other regulations if it obtained an exemption from the CPSC. *See* 15 U.S.C. § 1203(b).

The 1976 legislative history asserts that the change in the preemption language was intended to "resolve any ambiguity," and it is clear from the history, and from the statutory language of sections 1203(a) and (b), that federal flammability standards were to be not "merely minimum standards" but "uniform national requirements." S.Rep. No. 251, 94th Cong., 2d Sess. 12 (1975). Thus, absent an exemption, a state could not adopt a statute requiring a higher standard; but the question remains whether a jury in a common-law tort action may find that a garment meeting the standard was defectively designed.

The legislative history does not directly answer this question. It does suggest that Congress expected the preemption provision of the Flammable Fabrics Act to be inter-

---

**2.** The standard had been promulgated by the Secretary of Commerce earlier in 1953 as part of a program of voluntary compliance, but was not mandatory until its incorporation into the statute.

preted in substantially the same way as language pertaining to the Hazardous Substances Act, 15 U.S.C. § 1261 *et seq.*, which was adopted at the same time. S.Rep. No. 251, *supra*, at 11–12. The latter (uncodified) provision, like the Medical Device Amendments of 1976 at issue in *Lohr*, preempts deviating state "requirements." 90 Stat. 510–11; *see* 15 U.S.C. § 1261 (note captioned "Effect Upon Federal and State Law" following section.)

But there is no indication that Congress in 1976 knew that "requirements" would later be read to encompass common-law doctrine. The examples in the 1976 legislative history of varying state requirements intended to be preempted involved legislative and administrative regulation (*e.g.*, "safety regulations applicable to bicycles"), not common-law tort actions. *See* S.Rep. No. 251, *supra*, at 11–12. Realistically, the legislative history is as much a wash as the statutory language.

The third resort of puzzled courts is to policy, principally the policy that Congress was seeking to implement in adopting the statute. But here again good arguments exist on both sides. Preempting common-law tort actions does foster uniformity, especially important where goods are shipped among states and their standards may vary; but in cases like this it does so at a price, namely, depriving the public of any fall-back protection where agency regulation is incomplete or inadequate. Depending on circumstances, the price may or may not be one that Congress wants to have paid.[3]

■ Indeed, absent a preemption clause, the general rule is that administrative approval of a practice is pertinent information for a jury but does not impliedly cut off common-law claims reflecting a higher standard of care. *Raymond*, 484 F.2d at 1027; *Restatement (Second), Torts* § 288C (1965). There is some tension between this proposition and the tendency of federal courts— relying on statutory language that is less than crystal clear—to preempt state claims based on federal-agency approvals. For the

moment, the Supreme Court's inclination is balanced almost on a knife edge, as the divisions in *Lohr* amply confirm.

■ In our view, the present case has no inescapably "right" answer judged by traditional tests. Literal language slightly supports Wilson, but that support is tempered both because Congress did not consciously focus upon the issue and because *Lohr* has read closely related (though distinguishable) language in favor of limited preemption. Legislative history is of little help, and there are policy arguments on both sides. Under these circumstances our last resort is to ask what result makes the most sense, or, more formally, how Congress would have decided the issue if Congress had squarely confronted it.

By this test of reasonableness, a decision in favor of Wilson is far easier to defend at the present stage of federal regulation. The current flammability standard is not one adopted by the federal agency after a searching inquiry into what best serves the public interest. It is an industry devised standard that has been perpetuated by CPSC inaction in the teeth of some indications that the standard is not adequate. This, at least, was the preliminary judgment of the Commerce Department (normally no enemy of industry).

Indeed, commenting on the evidence at trial in a flammability case, one state appeals court commented:

> There was substantial evidence at trial which established that the CS 191–53 test was not a valid indicator of the flammable characteristics of fabrics and did not take into account the uses to which a fabric would be put in determining its safety. [footnote omitted] It was shown that newspaper passed the CS 191–53 test with a 48–percent margin of safety.

*Gryc v. Dayton–Hudson Corp.*, 297 N.W.2d 727, 734 (Minn.), *cert. denied*, 449 U.S. 921, 101 S.Ct. 320, 66 L.Ed.2d 149 (1980). Whether or not this is a fair appraisal of CS 191–53—a point on which we have no knowl-

---

**3.** Congress has sometimes been taken explicitly to preempt some common-law claims (*e.g., Lohr*), sometimes has expressly rejected such a course (the Consumer Product Safety Act, 15 U.S.C. § 2074(a)), and sometimes has expressed delphic views (our case) or none at all (as in the 1953 version of the statute).

edge—it does show why one needs to be cautious in giving conclusive weight to an industry standard.

Industry standards serve many useful purposes, but we do not think that Congress, if squarely asked to address the issue, would say that such a standard should extinguish a common-law claim of design defect. If the defendants want to show that they met a prevailing industry standard, fine; but this should not preclude a plaintiff from showing that industry should have done more under certain conditions. Federal regulation may be a substitute for common-law liability; industry self-regulation is not. *See The T.J. Hooper,* 60 F.2d 737, 740 (2d Cir.) (L. Hand, J.), *cert. denied,* 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571 (1932).

In this respect, the present standard is in sharp contrast to the typical regulatory directive or stamp of approval, say under the Medical Devices Amendments, that represents an independent federal-agency judgment. This could well be a different case if we were dealing with a flammability standard adopted by the CPSC after an administrative inquiry and an agency decision that it was the proper standard for the future. It would certainly be a different case, judged by Justice Breyer's opinion in *Lohr,* if the CPSC also made clear that the new standard was intended to preempt common-law claims. *Lohr,* —— U.S. at —— – ——, 116 S.Ct. at 2260–61.

In resolving this difficult issue, we have not expressly relied upon general statements in prior Supreme Court and other appellate decisions to the effect that federal displacement of state regulation relating to health and welfare is not lightly to be inferred. *See Levesque v. Miles, Inc.,* 816 F.Supp. 61, 65 (D.N.H.1993) (collecting numerous quotations). It is not entirely clear how much force this proposition retains in the construction of express preemption clauses. *Compare Lohr,* —— U.S. at ——, 116 S.Ct. at 2250 (four justice plurality) *with id.* at ——,

116 S.Ct. at 2263 (four justices concurring and dissenting). To the extent that the proposition does retain force, it would lend further weight to our resolution of this case.

So far as we know, our case is one of first impression in the federal courts of appeals. Our own *Raymond* decision ruled against preemption of a state tort claim under the Flammable Fabrics Act, but the statutory language in effect then was different. Only one appellate decision directed to the present language has been called to our attention, the *Gryc v. Dayton–Hudson Corp.,* case cited earlier; and while it ruled against preemption, it did so without the benefit of recent Supreme Court rulings in *Cipollone* and *Lohr* and on grounds different from our own.

We have not discussed the many precedents in this court that relate to preemption clauses under other statutes.[4] Some of our own decisions, pushing preemption quite far, caused the district court to reverse its original inclination not to preempt. But these decisions involved different statutory language—usually the more common term "requirements"—and some affirmative federal agency regulation. Further, *Lohr* has changed the ambiance. Our best judgment is that the district court was right the first time.

*Application to warning claims.* Our conclusion makes it unnecessary to treat the warning claims separately but we do so out of an abundance of caution. Even if we concluded that the design claims were preempted, we think that Wilson's failure-to-warn claims would not automatically be preempted. If the present case is tried, the district court may wish to consider obtaining special verdicts distinguishing between the two sets of claims.

At first blush, the argument against preemption of a failure-to-warn claim might appear overwhelming. After all, a fabric meeting the CS 191–53 standard could well be generally suitable for use but dangerous in

---

**4.** *E.g., Talbott v. C.R. Bard, Inc.,* 63 F.3d 25 (1st Cir.1995), *cert. dismissed,* —— U.S. ——, 116 S.Ct. 1892, 135 L.Ed.2d 169 (1996) (FIFRA); *Mendes v. Medtronic, Inc.,* 18 F.3d 13 (1st Cir. 1994) (Medical Device Amendments); *King v. E.I. Dupont De Nemours & Co.,* 996 F.2d 1346 (1st Cir.), *cert. dismissed,* 510 U.S. 985, 114 S.Ct. 490, 126 L.Ed.2d 440 (1993) (FIFRA); *King v. Collagen Corp.,* 983 F.2d 1130 (1st Cir.), *cert. denied,* 510 U.S. 824, 114 S.Ct. 84, 126 L.Ed.2d 52 (1993) (Medical Device Amendments).

certain circumstances best addressed by warnings. Nothing in the CS 191–53 standard even purports to address the issue of warnings. Nor do defendants claim that the CPSC has elsewhere regulated the warnings on fabrics or clothes, as it is entitled to do under current law. *See* 15 U.S.C. § 1193(a).

The defendants point out that failure-to-warn claims have regularly been preempted under other regulatory statutes which contain somewhat similar preemption provisions. But some of these statutes are specifically designed to require federal label approval, *see, e.g., Lohr* (Medical Device Amendments); *King v. Dupont, supra,* 996 F.2d at 1347–48 (FIFRA); and preemption follows from the language of the statute once it is read to embrace common-law claims. Typically in such cases, the federal agency has actually exercised its power to dictate the warnings that should accompany the product.

Nevertheless, if we assume (contrary to our main holding) that section 1203(a) currently reaches common-law claims, the defendants do have a possible plain language argument that the statute preempts failure-to-warn claims as well as design defect claims. Section 1203(a) does *not* say that a state rule is preempted only if a federal rule addresses the same functional issue (*e.g.,* design, warnings). Rather, the statutory test is whether the state standard or other regulation "is designed to protect against the same risk of occurrence of fire with respect to which the [federal] standard or other regulation ... is in effect...."

In a general sense, a warning against flammability is designed to protect against fire risk, a risk already addressed by CS 191–53's flammability standard. In a narrower sense, the risk to which the warning is addressed is not "the same risk." CS 191–53 relates to physical elements, *e.g.,* the risks of quick ignition and high speed burning. By contrast, a warning is directed to the customer's mind and is likely intended to prevent the user from acquiring the garment or exposing it to heat or flame. In short, the statutory language ("same risk") does not clearly answer the question posed in this case.

One could say that wherever the CPSC has not yet chosen to regulate warnings, it follows that Congress would not have intended preemption of a state-required warning. This might be too broad a proposition: conceivably, the CPSC might consider whether warnings were needed and specifically reject them on the ground that an adequate flammability standard made them superfluous. *See generally Freightliner Corp. v. Myrick,* —— U.S. ——, ——, 115 S.Ct. 1483, 1487, 131 L.Ed.2d 385 (1995). If the CPSC so declared, perhaps the state could not then find that warnings were required. *Cf. Lohr,* —— U.S. at —— – ——, 116 S.Ct. at 2260–61 (Breyer, J., concurring).

However, at present there is no such federal determination either regulating the warnings or rejecting any need for them. To preempt state regulation would create a regulatory gap. Of course, state regulation of warnings may be diverse rather than uniform; but if the industry finds this inconvenient, it may petition the CPSC to regulate warnings. Such regulation, because it would unquestionably be directed at the "same risk," would certainly preempt positive-law regulation by the state—and perhaps common-law tort claims as well.

The defendants assert that the duty to warn under New Hampshire law is simply "part of the general duty to design, manufacture, and sell products that are reasonably safe for their foreseeable uses." *Cheshire Medical Center v. W.R. Grace & Co.,* 853 F.Supp. 564, 566–67 (D.N.H.1994), *aff'd,* 49 F.3d 26 (1st Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 304, 133 L.Ed.2d 209 (1995). They suggest that if federal law prevents an attack on the safety of the product, it should also prevent an attack on a failure to warn that grows out of the same general duty. This is a half truth, but the true half needs some attention.

 Failure-to-warn claims are not all of a piece, and the label attached to the claim is not conclusive. Pertinently, some failure-to-warn claims may be nothing more than a disguised attack on the design of the product. Thus, a plaintiff might argue that a fabric, although it met CS 191–53, was inherently so unsafe that it could not properly be marketed

for clothing. Such a claim would be precluded—if the statute did preempt common-law claims at all—regardless of whether the plaintiff formally framed its claim as one for design defect or for lack of warning.[5]

Still, it is also possible to frame failure-to-warn claims that assume that the product is generally safe but insist that some special warning is needed in special circumstances; by analogy, a highway bridge might be perfectly safe for general traffic but require a warning against use by trucks over a certain weight. *See Chellman v. Saab–Scania AB,* 138 N.H. 73, 637 A.2d 148, 150 (1993); *Restatement (Second) Torts* § 402A, comment h (1965). Drawing the distinction may present nice questions in an individual case, but that is what judges are paid to do.

The distinction is of less importance in the present case because we have held that CS 191–53 does not preclude common-law design claims. Accordingly, Wilson may assert both that the design was defective (even though the fabric complied with CS 191–53) and that various warnings should have been supplied. Conversely, to the extent that compliance with CS 191–53 is evidence of reasonable design, that evidence might be pertinent—depending upon state law—both to a design claim and to a warning claim insofar as the latter implicitly challenged the safety of the product.

To summarize our holdings, we conclude first that at the present time Wilson's common-law claims are not preempted even though they may invite a factfinder to conclude that CS 191–53 is inadequate. We do not decide what result would be reached if the CPSC adopted its own flammability standards, and something might depend on exactly what the CPSC said and did. Further, and as an alternative ground as to Wilson's warning claims, we conclude Wilson's failure-to-warn claims would not in any event be preempted so long as they did not seek to impeach CS 191–53.

Resolution of this appeal was delayed in the hope that the then-anticipated decision of the Supreme Court in *Lohr* would provide more guidance than ultimately proved to be the case. Not only is *Lohr* not conclusive on our own issue, but the divisions there make even more general forecasts shaky. Absent guidance, we have done as best we can with these difficult problems of preemption in a changing legal climate. Given the time already consumed in delay in this case, the parties may want to consider whether they can reach a solution short of further litigation.

*Reversed.*

5. *Grenier v. Vermont Log Buildings, Inc.,* 96 F.3d 559, decided today (1st Cir.1996) (presenting the obverse case of a preempted warning claim disguised as a design claim); *In re DuPont–Benlate Litigation,* 859 F.Supp. 619, 623–24 (D.P.R.1994) (same).