Adam **JOHNSTON, a minor, by Susan JOHNSTON, his mother and next friend, and Susan Johnston and Garnett Johnston, Plaintiffs,**

v.

**DEERE & COMPANY, Defendant.**

**Civil No. 96–192–P–H.**

United States District Court,
D. Maine.

March 25, 1997.

---

George W. Beals, Thomas J. Quinn, Beals & Quinn, Portland, ME, for Plaintiffs.

Harold J. Friedman, Tracy D. Hill, Friedman & Babcock, Portland, ME, for Defendant.

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT BASED ON PREEMPTION

HORNBY, Chief Judge.

When the Consumer Product Safety Commission first proposes a rule requiring a safety device and then withdraws it, does federal preemption occur under 15 U.S.C. § 2075(a) to prevent state products liability lawsuits? I conclude that the recent First Circuit Court of Appeals decision, *Wilson v. Bradlees of New England, Inc.*, 96 F.3d 552 (1st. Cir. 1996), *cert. denied*, No.96–1014, —— U.S. ——, 117 S.Ct. 1083, 137 L.Ed.2d 218 (1997), requires that this question be answered "no."

### I. Background

Adam Johnston was two and one-half years old in 1995 when his right foot was

1. The plaintiff's claims include: strict liability for design defect and failure to warn (Counts I and II), breach of warranty (Count III), negligence

severely injured by the spinning blades of a riding lawn mower which, the plaintiffs claim, was being operated in reverse. The mower was manufactured by Deere & Company ("Deere"). Adam and his parents are suing Deere for not equipping its riding mowers with a "no-mow-in-reverse" ("NMIR") device, which stops the blades from rotating before the mower can move in reverse, on the theory that failure to include an NMIR device is a design defect.[1] Deere has moved for summary judgment based on federal preemption.

The Consumer Product Safety Act ("Act"), 15 U.S.C. § 2051 *et seq.* gives a federal agency, the Consumer Product Safety Commission ("Commission"), power to regulate lawn mower safety. *See* 15 U.S.C. § 2053. The Commission has considered requiring that riding mowers be equipped with NMIR devices, and even proposed a rule that included such a requirement, 42 Fed.Reg. 23,052, 23,071 (1977), but ultimately withdrew the proposed rule after a notice and comment period, 49 Fed.Reg. 31,908 (1984). Deere argues that permitting a jury now to impose liability for failure to include a NMIR device would violate the Act, because the Commission has preempted the field.

### II. Legal Analysis

Section 2075(a) of the Consumer Product Safety Act states:

Whenever a consumer product safety standard under this Act is in effect and applies to a risk of injury associated with a consumer product, no State or political subdivision of a State shall have any authority either to establish or to continue in effect any provision of a safety standard or regulation which prescribes any requirements as to the performance, composition, contents, design, finish, construction, packaging, or labeling of such product which are designed to deal with the same risk of injury associated with the consumer product, unless such requirements are identical to the requirements of the Federal standard.

(Count IV), punitive damages (Count V), and a derivative claim by the parents of the injured boy (Count VII).

15 U.S.C. § 2075(a). This provision has not been altered since the Act became law in 1972. Pub.L. No. 92–573, sec. 26 (1972).

In *Wilson*, the First Circuit dealt with comparable preemption language in the Flammable Fabrics Act:

> [W]henever a flammability standard or other regulation for a fabric, related material, or product is in effect under this chapter, no State or political subdivision of a State may establish or continue in effect a flammability standard or other regulation for such fabric, related material, or product if the standard or other regulation is designed to protect against the same risk of occurrence of fire with respect to which the standard or other regulation under this chapter is in effect unless the State or political subdivision standard or other regulation is identical to the Federal standard or other regulation.

15 U.S.C. § 1203(a). The First Circuit found no preemption of state common law tort lawsuits on the following reasoning: (1) The language of the statute could be read either way. 96 F.3d at 554–55.(2) The legislative history was "as much a wash as the statutory language." *Id.* at 556.(3) The policy arguments were equally strong on both sides (uniformity versus fallback protection where agency regulations are incomplete or inadequate). *Id.* (4) The federal flammability standard had not been adopted after a searching inquiry, but was an industry devised standard "perpetuated by CPSC inaction in the teeth of some indications that the standard is not adequate." *Id.*

■ Applying that reasoning to this case, I reach the following conclusions. First, the pertinent language of the preemption provision is in all material respects the same. The Flammable Fabrics Act construed in *Wilson* preempts a state "flammability standard or other regulation" whereas the Consumer Product Safety Act preempts "any provision of a safety standard or regulation which prescribes any requirements. . . . ." It is true that in *Medtronic, Inc. v. Lohr,* the Supreme Court read the term "requirement" as preempting common law rules, ——— U.S. ———, ——— – ———, 116 S.Ct. 2240, 2259–60, 135 L.Ed.2d 700 (Breyer, J., concurring), ——— – ———, 116 S.Ct. at 2262–63 (four justices concurring in part) (1996), but in *Wilson,* the First Circuit seems to suggest that the particular term "regulation" does not make much of a difference. 96 F.3d at 554. In any event, the Consumer Product Safety Act provision does not talk about state "requirements," a broad term, but instead about a state "safety standard or regulation which prescribes any requirements." Thus, "safety standard or regulation" is the pertinent language, which is comparable to "flammability standard or other regulation" in the Flammable Fabrics Act. Accordingly, following *Wilson,* I must find that the statutory language "could be read either way." 96 F.3d at 555.

Second, the parties have not pointed to any legislative history that would assist interpretation of the ambiguous statutory language. As in *Wilson,* therefore, the legislative history "is as much a wash as the statutory language." *Id.* at 556.

Third, the policy arguments are the same as in *Wilson* and, therefore, as in *Wilson,* their strength on both sides prevents reaching a conclusion. *Id.*

Fourth, I turn, accordingly, to the nature of the federal standard as the court did in *Wilson.* In the promulgation of consumer product safety rules, including standards, the Commission must publish a notice of the proceeding in the Federal Register. Pub.L. No. 92–573, sec. 7(b) (1972) (codified as amended at 15 U.S.C. § 2058). Here, the Commission published notice of the proceeding in 1974. 39 Fed.Reg. 20,662 (1974). Under the statute then in effect, the Commission was next either to publish a notice withdrawing the notice of the proceeding, or publish a proposed rule. Sec. 7(f). In May, 1977, the Consumer Product Safety Commission proposed to adopt a standard requiring that "[t]he blade of a riding mower shall be inoperative while the transmission or traction drive is positioned for reverse travel." 42 Fed.Reg. 23,071 (1977) (proposed to be codified at 16 C.F.R. § 1205.11). Finally, the Commission had 60 days after publication of a proposed rule either to promulgate the rule or to withdraw the notice of the proceeding, if it determined that the rule was not "(i) reasonably necessary to elimi-

nate or reduce an unreasonable risk of injury associated with the product, or (ii) in the public interest." Sec. 9(a)(1). On August 9, 1984, the Commission withdrew the proposed standard (along with others). 49 Fed. Reg. 31,908 (1984). The Commission gave the following reasons.

[B]ased on engineering judgment, riding mowers meeting these requirements should be safer than those that do not. In fact, the current ANSI standard contains requirements similar to some of these proposals. However, many of the proposed requirements address accident modes that can be affected by dynamic factors that are not accounted for in the proposed tests. In addition, the riding mowers currently on the market would have to be evaluated to see the extent to which they currently fail to comply with the proposed requirements, in order to help determine if the requirements are reasonably necessary. For these reasons, much work would need to be done before the Commission could draw the statutorily required conclusion that the cost of incorporating the features needed to comply with the proposed requirements would be justified by any benefits to be obtained.

. . . . .

Therefore, the Commission has decided to instruct its staff to monitor the development of the voluntary standard and is withdrawing its proposal of a mandatory standard for riding mowers. If in the future the effort to develop an adequate voluntary standard proves unsuccessful, the Commission can consider at that time whether to take additional steps that might lead to the development of a mandatory standard.

49 Fed.Reg. 31,911 (1984).

Although the Commission did not explicitly state the standard was not "reasonably necessary," the Commission did state that evaluation of mowers on the market was required, "in order to help determine if the requirements are reasonably necessary." *Id.* 31,911.

The Commission concluded that pursuant to section 9(a)(1) of the Act, the proposed standards, including a NMIR requirement, were withdrawn. *Id.* 31,912.

Under this statutory framework, therefore, no standard or regulation is "in effect" under the preemption provision of the Act. 15 U.S.C. § 2075(a). Simply put, a standard was proposed and then withdrawn, leaving nothing "in effect" to preempt the states.

In withdrawing the proceeding, the Commission indicated a willingness to defer to voluntary standards rather than promulgate a mandatory rule. *See* 49 Fed.Reg. at 31,-911. Although I find this deference to voluntary standards not to be a standard "in effect" for preemption purposes, I observe that *Wilson*'s analysis leads to the same conclusion even if it is called a standard "in effect." In *Wilson,* the Secretary of Commerce began a rulemaking proceeding in 1968, but never completed the adoption of any new federal flammability standards and, therefore, the applicable standard to be enforced by the Consumer Product Safety Commission was an industry standard that Congress had first adopted in 1953. 96 F.3d at 555. According to *Wilson,* "[f]ederal regulation may be a substitute for common-law liability; industry self-regulation is not." *Id.* at 557 (citation omitted).

Finally, I conclude, in light of *Wilson,* that little is to be gained by discussing other precedents or, indeed, the precedents from other Circuits that the parties have cited. *Wilson* explicitly pointed out that there are many precedents discussing preemption clauses. In *Wilson*'s words: "These decisions involved different statutory language— usually the more common term requirements'-and some affirmative federal agency regulation. Further, *Lohr* has changed the ambiance." *Id.*

■ I conclude, therefore, that the Consumer Product Safety Act does not preempt product liability tort recovery under Maine law [2] when the Consumer Product Safety

---

**2.** Although the parties have not argued the point, I observe that strict liability in Maine is a product of statutory law. 14 M.R.S.A. § 221. Essentially the Maine Legislature adopted the Restate-

ment principles for strict liability, Restatement (Second) of Torts § 402–A (1965). Those principles, however, are not a positive enactment of a safety standard or regulation, but instead are a

Commission withdraws, rather than adopts, a proposed rule requiring a safety device. Accordingly, the defendant's motion is DENIED.

SO ORDERED.

method of analysis. I conclude, therefore, that statutory adoption of strict liability principles in a state like Maine should not make the result different here than it would be in a state where the courts simply use the Restatement principles as a matter of common law.