Allison WILLIAMS, Plaintiff, Appellant,

v.

MONARCH MACHINE TOOL COMPANY, INC., Defendant, Appellee.

No. 93–1182.

United States Court of Appeals, First Circuit.

Heard Feb. 9, 1994.

Decided June 9, 1994.

Joseph M. Orlando with whom Brian S. McCormick and Orlando & Associates, Glouchester, MA, were on brief, for appellant.

Terrance J. Hamilton with whom Casner & Edwards, Boston, MA, was on brief, for appellee.

Before TORRUELLA, CYR and BOUDIN, Circuit Judges.

BOUDIN, Circuit Judge.

On March 23, 1988, Allison Williams, plaintiff in the district court and appellant here, was injured when he was struck by a "toolholder" that came loose from a vertical milling machine. At the time, Williams was working in Massachusetts for R & K Precision Tool Company ("R & K"). The vertical milling machine, owned by R & K, had been made in 1978 by Monarch Machine Tool Company ("Monarch"), the defendant-appellee in this case.

The machine in question was a computer assisted machining center that performs various functions such as milling, boring and fly cutting. At the time of the accident, the machine was being operated by a co-worker of Williams who had attached to the machine a fly cutter that had been made "in-house" by R & K. The fly cutter is a disk into

which a toolholder and attached tool can be inserted. The fly cutter then rotates on the spindle of the vertical milling machine and the rotating tool can be used to cut or shave a piece of metal.

In this instance, the co-worker who was operating the vertical milling machine had been requested by his foreman to machine a piece of aluminum into a specific configuration. After a few seconds of operation, in which the spindle rotated at 2500 rpms, the toolholder came loose from the set screws holding it to the fly cutter, and the toolholder struck Williams who was standing nearby. He was seriously injured.

Williams brought suit in the district court against Monarch. His complaint, claiming negligence and breach of warranty, rested on two notions as to what Monarch had done wrong. First, Williams contended that Monarch should have provided shielding to contain ejected projectiles, a danger that Williams said was known to Monarch. Second, the complaint said that Monarch should have warned users of the risk of such ejections so that in-house measures could be taken; in this connection, Williams contended that Monarch had an ongoing duty to warn prior purchasers of *new* shielding equipment developed after the machine's manufacture late in 1978 but before the accident in 1988.

The trial took place in January 1993. At trial, there was expert evidence on both sides on issues of shielding, warning and causation. There was also evidence concerning proper use of the vertical milling machine and the industry standards bearing on the respective responsibilities of manufacturers and users in providing guards and shields. Answering specific interrogatories, the jury found against Williams, and for Monarch, on each of the claims against Monarch.

Following the jury verdict, Williams moved for a new trial asserting as grounds the two issues now raised on this appeal. One is Williams' claim that the district court wrongly admitted testimony from a second expert witness, who was belatedly produced by Monarch and who testified at trial; and the other is that an instruction requested by Williams, affirming the manufacturer's ongoing duty to warn even after a machine is sold, should have been given. The district court denied the motion, and Williams appealed. We affirm.

The events relating to the second expert can be briefly summarized. As is common in cases where experts are anticipated, interrogatories under Fed.R.Civ.P. 26 were employed by the parties to identify experts and their expected testimony. After successive extensions, Monarch on October 16, 1991, identified its expert as David Lundeen, a vice president of Monarch, and described the substance of his testimony. Williams' answers identified his own expert. Thereafter, Lundeen was deposed by Williams.

At a March 26, 1992, pretrial conference, the district court set January 4, 1993, as a firm trial date. The court also ordered the parties to make certain filings during the four weeks preceding the trial date, including the listing of the names of all witnesses, lay and expert. On December 4, 1992, a month before the scheduled trial, Monarch filed "further supplemental answers" in response to Williams' prior "expert" interrogatories identifying for the first time Ralph Barnett as an additional expert witness.[1]

On December 28, 1992, Williams filed a motion *in limine* to exclude Barnett's testimony on the ground that Barnett's late appearance would prejudice Williams. At a hearing on January 11, 1993, immediately before the start of trial, the district court heard argument on the *in limine* motion and offered to postpone the trial for a week and permit Barnett's deposition to be taken. When Williams' counsel said that this would not cure the prejudice, the court proceeded with the trial immediately. Later, the court approved the taking of Barnett's deposition during a recess of trial on January 13, 1993, the day before Williams' own expert was scheduled to testify.

On appeal, Williams argues that the district court abused its authority by refusing

---

1. The December 4 filing also identified another previously unnamed expert for the defense. However, this third expert was never proffered at trial and need not be discussed further.

to exclude Barnett's testimony. Williams contends that Barnett did not merely repeat Lundeen's opinions but added new theories of his own. Williams brushes aside the proffered one-week extension as wholly inadequate to allow the counsel to depose Barnett, to develop adequate rebuttal information, and to allow Williams' own expert the time to adjust his own testimony to answer the new theories. Monarch, in turn, belittles the importance of Barnett's testimony and argues that his late appearances violated no rule or order.

In our view, the last-minute appearance of new expert witnesses, or substantial expansion of previously disclosed expert testimony, has become a troublesome feature of civil litigation. Such last-minute expert testimony is often improvisation rather than ambush, but it can still undermine trial preparations carefully made by an adversary over many months or even years. For this reason, some district judges enter pre-trial orders setting explicit deadlines for the naming of experts and then allow new ones to be named after those deadlines only for good cause shown. *Cf.* Local R. 26.4 (D.Mass.).

Rule 26 interrogatories do not have quite the same effect. Formally, the answers reflect counsel's good-faith expectation as to the experts to be offered, and the rules themselves (as phrased in 1992) underscored this qualification by imposing a duty "seasonally to supplement" a prior answer identifying an expert or revealing the substance of expert testimony. *See* former Fed.R.Civ.P. 26(e)(1)(B). Of course, it would violate this duty to name belatedly an expert who had been retained by the naming party at a substantially earlier time. Here, however, Monarch says that it named Barnett shortly after determining to use him, and there is no evidence to the contrary.

Our situation falls somewhat in between an outright requirement that experts be named no later than a specified date and the ordinary use of Rule 26 interrogatories. Here, the original scheduling order from the magistrate judge, extended several times, directed that "full and complete answers" to expert interrogatories be furnished by listed dates and set still later dates for the completion of all discovery. It may well have been the intention of the magistrate judge that this be read as an outright cut-off for the naming of experts even though the order is not framed in quite these terms.

When on the day of trial the parties presented their positions to the district court, the matter was blurred. Williams did not explain his position with exactness, while Monarch argued (untenably) that, even if a prior deadline had been set, it was relaxed implicitly by the district court's routine order saying that all witnesses be listed a month or so before trial. Without resolving the dispute, the district court said that it would not bar important expert testimony in a case with a large *ad damnum* when a continuance would remedy the problem. However the magistrate judge's order is read, the district court was free to alter previous deadlines.

■ Conversely, even if the magistrate judge's order left open the ordinary supplementation option, this court has held that trial judges have inherent discretionary authority to exclude expert evidence where Rule 26 interrogatories have been employed and where the court finds that the supplementation was not seasonable. This is so even though the late-named expert was disclosed as soon as he or she had been retained. *Fusco v. General Motors Corp.*, 11 F.3d 259, 265–66 (1st Cir.1993); *Thibeault v. Square D Co.*, 960 F.2d 239, 245 (1st Cir. 1992). If the district court in this case had decided to preclude Barnett's testimony as not "seasonably" disclosed, such a decision would likely have been sustained.

■ But the broad discretion of trial judges to manage scheduling, discovery and sanctions cuts both ways. Through no one's fault, evidence is sometimes obtained belatedly when a gap in proof is perceived or a new source is uncovered. Discovery aims only to mitigate surprise, for nothing can eliminate it entirely from trial practice. Interrogatory answers are supplemented in widely varying circumstances, so that great deference must be afforded to the judge on the spot in devising the proper remedy. *See, e.g., Nickerson v. G.D. Searle & Co.*, 900 F.2d 412 (1st Cir.1990).

Here, the trial court did offer a week's delay and a good deal can be done in a week. We appreciate that counsel who accepts a half measure under protest may preserve the claim of error but greatly reduces the likelihood of success in any later appeal. Yet, settling a case prepared for trial requires compromises, and it is generally right to insist that counsel take the best deal offered under protest, do the best job possible and then (if the verdict goes the other way) argue to the appeals court that what was allowed was not enough. At least then there is a concrete record to show what could be done in the time allowed.[2]

We do not suggest that Williams waived his right to appeal by rejecting the district court's proposals. If Williams' trial counsel thought that a week was close to useless and had other reasons to move swiftly to trial, nothing prevents Williams from arguing now on appeal that preclusion of the testimony was the *only* permissible remedy. But by rejecting the proffered half-measure, Williams inclines a reviewing court to resolve any legitimate doubts about whether a week might have been enough in favor of the district judge's view that it would have been sufficient.

In this case we have reviewed the interrogatory answers as originally directed to Lundeen's proposed testimony and compared them to testimony actually given by Barnett at trial. There is no value in repeating details here; it is enough to say that Williams is right in urging that there were substantial differences—not so much contradictions as new theories—that required new lines of questioning by Williams' counsel and new rebuttal from Williams' own expert. What we cannot say is that the district court abused its discretion in thinking that an *extra week* was enough to allow Williams to adjust his position.

Williams points to the many demands on counsel in the weeks before a scheduled trial, but what was offered was an *extra* week to be derived by postponing the trial. Almost all of this time was presumably available for the task of deposing Barnett, gathering material about him and his testimony and preparing Williams' own expert on any new subject matter. Indeed, had Williams' counsel made the effort, he would have been better placed at the end of the week to argue that still more time was required. Under all the circumstances, we do not find that the district court abused its discretion in refusing to exclude Barnett's testimony.

Williams' brief twice suggests that the district court withdrew its original offer of a week's extension because Williams refused to accept it as adequate to avoid prejudice from the late disclosure. Without generalizing too broadly, we agree that it would be a matter of some concern if a district court refused to provide a limited postponement unless the party offered it waived the party's claim that a longer extension was required. In this instance, however, we do not read the record to establish such retaliation.

We think that the district judge may reasonably have gained the impression (based on the colloquy with Williams' counsel) that Williams was not in fact interested in a continuance in order to cure the surprise, but only in preserving for appeal the position that the failure to exclude Barnett's testimony was error. In all events, when the district court finally announced its intention to proceed with trial at once, there was no further response from Williams' counsel. This would be a different case if at that point Williams had said that he did want a week's continuance and was merely refusing to waive his right to appeal.

■ Williams' second and quite separate claim of error is directed at the district court's refusal to give the following requested instruction:

> The need to exercise reasonable care to prevent injuries to foreseeable users of a product included a duty at least to inform user (sic) of a product [of] safety improve-

---

2. In fact, the district court initially offered Williams a continuance without limiting the offer to a week and only specified the one-week delay when Williams did not state a figure of his own, assertedly fearing a long delay in getting the plaintiff's case to trial. There is little to suggest that the district court would not have entertained a request for a longer continuance, especially if based on a more substantial effort by counsel to do the best he could during the original week.

ment of equipment which would lessen the risk of injury that has developed after the sale of the product, but before the injury occurs.

In requesting this instruction, which the district court declined to give, Williams' trial counsel relied upon *doCanto v. Ametek, Inc.*, 367 Mass. 776, 328 N.E.2d 873 (1975), and *H.P. Hood & Sons, Inc. v. Ford Motor Co.*, 370 Mass. 69, 345 N.E.2d 683 (1976).

It is Williams' position that the vertical milling machine in question, made in 1978, should have been equipped with an optional chip guard of a type that Monarch later came to use for most of its machines; that by the late 1980's, 85 to 90 percent of newly produced Monarch machines were sold with these enclosures; and that Monarch was aware of the unguarded R & K machine and serviced it from time to time but did not give R & K warning of the guards after the sale of the machine but prior to the accident in 1988.

Williams does not claim that the instructions actually given were faulty in defining Monarch's duty at the time it made and sold the machine in question. Rather, Williams argues that a manufacturer who has discharged all duties at the time the product was produced and sold will still be liable if it fails unreasonably to advise a prior purchaser of the product of new, safety enhancing improvements made after the sale. We can find no indication that such a rule has been adopted in Massachusetts, whose law governs in this case.

In *doCanto*, the decision principally relied on in Williams' brief, the Massachusetts Supreme Judicial Court sustained the admissibility of evidence showing improvements made after the sale of the product but before the accident; but the court did not adopt the view "that there was a continuing duty to warn purchasers of safety improvements [later] made to a machine which was reasonably safe at sale." 328 N.E.2d at 877. Rather, the court found that the evidence was pertinent to issues of liability at the time of sale

(*e.g.*, feasibility, knowledge of risk). *Id.* The court implied that the manufacturer would have been entitled to a limiting instruction on the permissible use of the evidence. *Id.*

The *doCanto* decision goes no further than to say that a duty to warn of post-sale safety improvements "may" exist where the machine as originally sold was of "negligent design." 328 N.E.2d at 877. This dictum, even if "does" were substituted for "may," would do Williams no good because in this case the jury's answers showed that it did not find that the machine as originally sold had been negligently designed. Indeed, in *Hayes v. Ariens Co.*, 391 Mass. 407, 462 N.E.2d 273 (1984), the court said: "We did not say in *doCanto*, and we have never said, that a manufacturer has a duty to advise purchasers about post-sale safety improvements that have been made to a machine that was reasonably safe at the time of sale." [3]

Some courts have adopted the view that there are broad post-sale duties to warn, *e.g.*, *Kozlowski v. John E. Smith's Sons Co.*, 87 Wis.2d 882, 275 N.W.2d 915 (1979), and there is some academic support for this extension. *E.g.*, Note, 33 *Stan.L.Rev.* 1087 (1981). Yet, there is no suggestion that this expanded duty is the prevailing view, still less that Massachusetts has adopted any such expansion. "We have warned, time and again, that litigants who reject a state forum in order to bring suit in federal diversity jurisdictions cannot expect that new trails will be blazed." *Ryan v. Royal Ins. Co. of America*, 916 F.2d 731, 744 (1st Cir.1990) (citations omitted).

Finally, if manufacturers were held in some situations to have a duty to search out prior customers and tell them of new improvements of products reasonably safe when sold one would expect that a duty potentially so far reaching would be qualified by other considerations and limitations (*e.g.*, the feasibility of conveying warnings to prior purchasers, the severity of the hazard, an imbalance between the parties as to knowledge). The broad language of the instruction proffered by Williams in the trial court con-

---

3. The *Hood* case, also relied upon by Williams, is even less helpful to Williams. *Hood* did involve in part a *federal* statute governing motor vehicle defects, *see* 345 N.E.2d at 687, and the statute

does address post-sale duties, *see* 15 U.S.C. § 1402; but there is no claim that this federal statute in any way governs vertical milling machines.

tains no such restrictions. In our view, this makes it even more unlikely that the instruction as framed represents the present state of Massachusetts law.

*Affirmed.*