# United States Court of Appeals
## For the First Circuit

No. 99-1779

ELIZABETH WILSON, INDIVIDUALLY AND AS MOTHER
AND NEXT FRIEND OF ALISA DEBOLD; ALISA DEBOLD,

Plaintiffs, Appellants,

v.

BRADLEES OF NEW ENGLAND, INC., UNION UNDERWEAR COMPANY, INC.
PARADISE SCREEN PRINTING CO., a/k/a PARADISE SCREEN PRINTING,
INC., SHARKY'S SPORTSWEAR CO., a/k/a SHARKY'S CLOTHING CO.,
a/k/a/ SHARKY'S DRY GOODS COMPANY, a/k/a SPORTSWEATS, INC.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph A. DiClerico, Jr., U.S. District Judge]

Before

Torruella, Chief Judge,

Lipez, Circuit Judge,

and Stearns,[*] District Judge.

Thomas Craig with whom David Woodbury and the Law Offices
of Thomas Craig were on brief for appellants.

[*]Of the District of Massachusetts, sitting by designation.

Alexander J. Walker, Jr. with whom Richard E. Mills, Daniel E. Will, Devine, Millimet & Branch, P.A., Michael J. Goldman and Hawkins & Parnell, LLP were on brief for appellee Union Underwear Company, Inc.

Dennis T. Ducharme with whom Wiggin & Nourie, P.A. was on brief for appellees Sharky's Sportswear Company and Paradise Screen Printing Company.

---

May 17, 2001

---

**STEARNS, District Judge.** This sad case began when twelve year old Ailsa Debold, irritated by a whistling tea kettle, leaned across a kitchen stove to turn off the burner. Her blended cotton and polyester sweatshirt came in contact with the burner and caught fire.[1] Ailsa suffered disfiguring second and third degree burns to her chest and abdomen.

Ailsa's mother, Elizabeth "Jane" Wilson, brought this lawsuit individually and as next friend of Ailsa.[2] Named as defendants were Union Underwear Company, Inc. (Union), the manufacturer of Ailsa's sweatshirt, Paradise Screen Printing Company (Paradise), which had silk-screened a college logo on the front of the sweatshirt, Sharky's Sportswear Company (Sharky's), the sweatshirt's wholesaler, and Bradlees of New England, the retail seller of the sweatshirt to Ailsa's mother.[3] The sweatshirt was an adult-large size, purchased by Elizabeth Wilson for her daughter in the Junior Miss Department of a

---

[1]Ailsa was also wearing a t-shirt and camisole underneath the sweatshirt. The sweatshirt and t-shirt were manufactured by the defendant Union. The camisole was not. The remains of the camisole were not preserved.

[2]Ailsa and her mother will be designated collectively in this opinion as a singular "plaintiff."

[3]Sharky's and Paradise are affiliated companies and consequently were treated as alter-egos during the litigation. Bradlees was dropped from the case after seeking bankruptcy protection for reasons unrelated to this case.

Bradlees store in Concord, New Hampshire, some five and one-half months prior to the accident.

The case was filed on January 29, 1993, and came previously before this court on plaintiff's appeal of a district court order granting summary judgment to all defendants. We reversed the district court's determination that the plaintiff's common-law products liability and failure to warn claims were pre-empted by section 1203(a) of the Flammable Fabrics Act (FFA), 15 U.S.C. §§ 1191-1204. See Wilson v. Bradlees of New England, Inc., 96 F.3d 552, 558-559 (1st Cir. 1996) (holding that a manufacturer's compliance with the FFA textile flammability standard is relevant, but not outcome determinative). After remand and further discovery, the district court granted summary judgment to Union on so much of plaintiff's failure to warn claim as involved the obvious danger that clothing can catch fire.

Trial began on April 6, 1999. At the close of plaintiff's evidence, the district court granted Union's motion for judgment as a matter of law on the balance of plaintiff's failure to warn claim. Judgment also entered for Sharky's on plaintiff's claim(s) of ordinary negligence. The case was submitted to the jury on the remaining claims of defective design, negligent manufacture, and strict products liability.

The jury, in answering a special verdict question, found that the sweatshirt had not been defectively designed and, pursuant to the instructions on the verdict slip, answered no further questions. Judgment thereafter entered for Union and Sharky's and this appeal ensued.

DISCUSSION

Plaintiff raises a variety of issues on appeal, the majority of which involve evidentiary rulings made by the district court. At oral argument, plaintiff's counsel stated that the alleged errors had been briefed in their considered order of importance. Consequently, they will be addressed for the most part in the same sequence.

Dismissal of the Failure to Warn Claim

On February 3, 1999, two months prior to trial, the district court entered partial summary judgment for Union, dismissing so much of plaintiff's failure to warn claim as involved an obvious danger. While rejecting Union's argument that plaintiff was required to prove causation by expert testimony, the district court tentatively agreed that the danger that clothing can catch fire if exposed to a heated stove burner is "probably obvious."[4] However, in light of Ailsa's deposition

_____

[4]Under New Hampshire law, a manufacturer is not required to give warnings against obvious dangers associated with the use of a consumer product. Cheshire Medical Center v. W.R. Grace &

testimony that she had been warned by her parents that fabrics can burn and that her clothing should be kept away from hot objects like stoves, the district court concluded that any necessity for a superabundant warning in Ailsa's case was "obviated."[5] The court, however, reserved for trial the issue whether Union had a duty to warn of the "particular" flammability characteristics of the sweatshirt that were not obvious, specifically the possibility that the sweatshirt could "ignite spontaneously," could "be very difficult to extinguish," or could "melt and cause a more severe burn."

At the close of plaintiff's evidence, the district court granted Union's motion for judgment as a matter of law pursuant to Rule 50(a) on the remainder of the duty to warn claim. The district court's reasoning was set out in a written opinion denying plaintiff's motion for a new trial. The court found that plaintiff had failed to prove that a more particularized warning as to the unwonted flammability characteristics of the sweatshirt would have prevented Ailsa's

_____

Co., 853 F. Supp. 564, 566-567 (D.N.H. 1994), *aff'd*, 49 F.3d 26 (1st Cir. 1995).

[5]At trial, Ailsa also testified that she always took care to insure that the kettle completely covered the burner because of the danger to her clothing.

spontaneous act of reaching for the kettle.[6]  Review of the district court's Rule 50(a) ruling is plenary.[7]  _Irvine_ v. _Murad Skin Research Laboratories, Inc._, 194 F.3d 313, 317 (1st Cir. 1999).

Plaintiff's attack on the district court's ruling has two facets.  First, plaintiff claims that the court erred by viewing the effect of a warning from Ailsa's vantage, rather than from the perspective of her mother.  The argument is based on a misreading of _Bellotte_ v. _Zayre Corp._, 352 A.2d 723 (N.H. 1973).[8]  In _Bellotte_, the New Hampshire Supreme Court held that

---

[6]Under New Hampshire law, strict liability, as well as negligence, requires proof of causation.  _Thibault_ v. _Sears Roebuck & Co._, 395 A.2d 843, 847 (N.H. 1978).

[7]Plaintiff does not quarrel with the district court's ruling that no warning of the obvious danger that clothing can burn was required.

[8]Plaintiff's argument that the district court erred in excluding Elizabeth Wilson's testimony, that had the sweatshirt displayed a warning label, she would have acted differently (by not purchasing the sweatshirt or by being more emphatic in warning Ailsa of the danger of fire), is premised on the mistaken contention that the court should have adopted the _Bellotte_ "reasonable parent" standard.  In any event, the district court properly excluded the testimony under Rule 701 as speculative and not based on Elizabeth Wilson's contemporaneous perceptions, a ruling well within the court's discretion.  _See_ _Washington_ v. _Department of Transportation_, 8 F.3d 296, 299-300 (5th Cir. 1993).  Of the two cases cited by plaintiff for the contrary proposition, the first, _Laramie_ v. _Sears Roebuck & Co._, 707 A.2d 443 (N.H. 1998), is not on point as the defendant raised no objection on appeal to the witness's testimony that had she been warned of the danger of scalding wastewater, she would not have bathed her baby in the sink while the dishwasher

because a five year old child inherently lacks the capacity to appreciate the unavoidable flammability danger inherent in all clothing, to frame the "unreasonably dangerous" test from the perspective of the child (as the plaintiffs in Bellotte urged) would "make the seller an insurer, a path we decline to follow." Id. at 725. Consequently, the court determined that the test should be framed in terms of the child's parent who purchased the clothing. The court, however, cautioned that "when it is practical to do so the warning should be given to the person who will use the product." Id. Ailsa was twelve years old when the accident happened and, in contrast to the five year old child in Bellotte, or the three year old child in Price v. Bic Corp., 702 A.2d 330 (N.H. 1997), nothing in the record suggests that she lacked the capacity to understand a warning.[9]

was running. The second case, Cyr v. J.I. Case Co., 652 A.2d 685 (N.H. 1994), is also distinguishable. In Cyr, a percipient witness to a construction accident was properly permitted to testify as to what *her* probable reaction would have been if she had heard an alarm as a bulldozer backed up. The court, however, also ruled that the trial court had properly excluded the witness's testimony speculating on what the *victim's* probable reaction would have been. Id. at 691.

[9]On our reading of the affidavit submitted by Ailsa in opposition to partial summary judgment we do not necessarily agree with the district court's remark that Ailsa would not have "understood and appreciated the particular flammability characteristics of the sweatshirt . . ., if those warnings had been provided." (Ailsa testified that she was not "aware" of these characteristics, not that she did not comprehend them). We do, however, agree with the district court's more fundamental

The second facet of plaintiff's attack is directed to the district court's failure to instruct the jury as to the so-called "read and heed" presumption approved by <u>Restatement (Second), Torts</u>, § 402A, comment j.

> Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous.

While it is clear from plaintiff's brief that it is Elizabeth Wilson and not her daughter for whom the presumption is principally advocated, Ailsa, as <u>Bellotte</u> instructs, is the appropriate focus. While the district held, accurately in our view, that no evidence had been presented that a particularized warning would have prevented Ailsa's instinctual reaction, plaintiff's argument also founders on the fact that New Hampshire has not adopted the "read and heed" presumption, and we will not do so on its behalf. Plaintiff chose to bring this lawsuit in federal court. "[L]itigants who reject a state forum in order to bring suits in federal court under diversity jurisdiction cannot expect that new trails will be blazed." <u>Ryan</u> v. <u>Royal Ins. Co. of America</u>, 916 F.2d 731, 744 (1st Cir. 1990). <u>See</u> <u>also</u> <u>Cheshire Medical Center</u>, 49 F.3d at 35

---

conclusion that plaintiff "offered no [competent] evidence that such [particularized warnings] would have altered Ailsa's conduct."

(declining to predict an expansion of the doctrine of strict liability under New Hampshire law in light of the state Supreme Court's historically conservative approach to products liability law).

The Sears & Roebuck Complaint

In October of 1998, plaintiff filed a separate lawsuit in the Massachusetts Superior Court against Sears & Roebuck, the manufacturer and seller of the stove, claiming that a defective heating element had been *the* proximate cause of Ailsa's injuries. On the fifth day of trial, while cross-examining Ailsa, counsel for Union asked whether she had "ever claimed that it was the stove that caused your injuries?" A seasonable objection was made. At sidebar, both counsel proceeded on the correct assumption that the admissibility of the Sears & Roebuck complaint depended on whether the pleadings were facially inconsistent. This precipitated a debate over the significance of the use of the definite article "the" (instead of the indefinite article "a") to describe proximate cause in the Sears & Roebuck complaint. The district court, apparently believing that the distinction made a difference, overruled the objection. Union's counsel then asked Ailsa if she had retained a lawyer to file suit against Sears & Roebuck. To this question Ailsa responded: "I can't be sure. That's left in my mother's hands,

I don't know."  After showing Ailsa the Sears & Roebuck complaint, counsel then asked: "And on page two of that complaint do you claim that the injuries that you sustained were the direct and proximate result of Sears, Roebuck?"  When Ailsa, understandably perplexed, replied "I don't remember that," plaintiff's counsel renewed the objection.  The court responded by refusing to admit the Sears & Roebuck complaint as an exhibit.  A few minutes later, counsel for Sharky's returned briefly to the subject, asking Ailsa whether in the complaint against Sears & Roebuck she had alleged that her injuries "[w]ere the direct proximate result of the carelessness, negligence, and it goes on here talking about [the] defectively designed stove and lack of warnings, is that correct?"  To this clumsily constructed question, Ailsa answered "correct."

The admission of inconsistent statements made in separate judicial proceedings to impeach a party is within the sound discretion of the trial judge.  Vincent v. Louis Marx & Co., Inc., 874 F.2d 36, 41 (1st Cir. 1989).  In exercising that discretion, the court must make an initial determination that the dueling pleadings are in fact contradictory.  Cf. Kassel v. Gannett Co., Inc., 875 F.2d 935, 952 (1st Cir. 1989).  It must then decide under Rule 403 whether the probative value of the inconsistent pleading is outweighed by the danger of unfair

-11-

prejudice to the party against whom it is offered.  Vincent, 874 F.2d at 41.  It is true, as Sharky's points out, that in Estate of Spinosa v. International Harvester Co., 621 F.2d 1154, 1157 (1st Cir. 1980), we focused on the inconsistency between pleading an event as "a cause" or as "the sole cause" of an accident.  However, we are not certain that this parsing has the same legal force that it might once have had, given the contemporary practice of defining proximate cause (however plead) as meaning "a substantial factor in bringing about the [complained of] harm."[10]  See Weldy v. Town of Kingston, 514 A.2d 1257, 1260 (N.H. 1986) (emphasis added).

But if we were to assume that the district court erred in permitting Ailsa to be cross-examined on the Sears & Roebuck complaint, we are confident that the error was harmless.  Even supposing that the jury was able to grasp the syntactic point that Sharky's counsel was trying to make, we cannot say that

_____

[10]Plaintiff's complaint that the district court did not employ Rule 403's balancing test before permitting Ailsa to be cross-examined about the Sears & Roebuck complaint is not borne out by the record.  While the judge permitted a few questions about the complaint to be put to Ailsa, he refused to admit the complaint or any portion of it into evidence.  Under the circumstances, we presume that the judge's calibrated decision-making reflects a striking of the balance that Rule 403 demands. There is no requirement that a judge place on the record a particularized analysis of his thought processes in ruling on an objection, especially where, as here, his actions speak for themselves.

teenaged Ailsa's adoptive answer to an awkward leading question "affected the outcome of the trial." Nieves-Villaneuva v. Soto-Rivera,133 F.3d 92, 102 (1st Cir. 1997).

The Dismissal of Negligence Claims Against Sharky's

At the close of plaintiff's evidence, the district court entered judgment as a matter of law in favor of Sharky's on plaintiff's claim of ordinary negligence, while permitting the case to go forward on the claim of strict products liability. Plaintiff's common-law claim against Sharky's was premised on an allegation of negligent design.[11] As the trial court observed in denying plaintiff's motion for a new trial, because Sharky's had played no role in the design of the sweatshirt, the claim could only be construed as impugning Sharky's role in fabricating the sweatshirt's college logo.[12]

---

[11]Plaintiff's late-blooming "negligent marketing" theory, whatever its substance, merits little discussion as there is no evidence in the record that Sharky's had supplied the adult-sized sweatshirt to Bradlees with the knowledge that it would be marketed to children. Moreover, the undisputed evidence is that Ailsa's mother bought the sweatshirt in Bradlees Junior Miss Department because Ailsa had outgrown children's wear. Plaintiff points us to an invoice reproduced in the Appendix as "undisputed" proof that "Sharky's sold the garments to Bradlees for the age 7-14 department." The invoice, however, was never admitted as an exhibit at trial.

[12]Plaintiff's argument, that because the trial court held Union to a duty of reasonable care in designing and testing the sweatshirt, "if this were true for Union it would also be true for Sharky's," confuses liability under the law of negligence with Sharky's potential liability as an intermediate vendor

Again, our review of the propriety of granting Sharky's Rule 50(a) motion is *de novo*.

The claim against Sharky's was pegged on the idea that for a penny more Sharky's could have used flame-retardant ink rather than ordinary ink in printing the logo. The suggestion was that flame-retardant ink might have prevented the combustion of the sweatshirt, or might have resulted in a lower intensity burn to Ailsa.[13] Whatever viability this theory might have had collapsed when the district court placed limits on the testimony of two of plaintiff's expert witnesses, Gordon Damant and Dr. Philip Colver.

Damant is a chemist and self-styled "internationally recognized authority on the flammability of consumer products." The court ruled that while Damant would be permitted to testify to matters involving chemistry and the flammable properties of polyvinyl chloride and plastisols, he would not be permitted to

---

under strict products liability law. Moreover, we agree with Sharky's that plaintiff failed to preserve the issue whether Sharky's had a duty under New Hampshire law to independently test the sweatshirt for hidden design defects. Even had the issue been preserved, we doubt that New Hampshire would impose such a duty on a seller who is not also the manufacturer of a product. See Buckingham v. R.J. Reynolds Tobacco Co., 713 A.2d 381, 385 (N.H. 1998).

[13]No evidence was offered as to the sweatshirt's point of ignition other than photographs and testimony indicating the general location of Ailsa's burns.

testify to usages and practices in the silk-screening industry, or to the commercial feasibility of printing shirt logos with flame-retardant ink. While the parties treat the ruling as falling under the reliability prong of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589-590 (1993), it is apparent from the trial transcript that the district court's focus was on Damant's lack of relevant knowledge and experience. Damant testified that he had no familiarity with the silk-screening industry, ink manufacture or logo design, that he had never conducted a comparison test of flame-retardant and ordinary inks, and that he knew of no silk-screener who in fact used flame-retardant ink to imprint logos. His only knowledge of the use of flame-retardant ink by clothing manufacturers was gleaned from a telephone conversation with an ink vendor who told him that it was used for children's sleepwear. There was no abuse of discretion in limiting Damant's testimony. Ferrara & DiMercurio v. St. Paul Mercury Insurance Co., 240 F.3d 1, 8 n.4 (1st Cir. 2001).

Dr. Colver's excluded testimony merits one paragraph in plaintiff's rambling brief. The district court refused to permit Dr. Colver to testify to a conversation he had had with an ink vendor supposedly confirming that the price of flame-retardant ink would have added only a penny's cost to the

printing of the sweatshirt's logo. Like Damant, Dr. Colver testified that he had no knowledge of the silk-screening industry or of printing inks, he had never tested the flammability of a logo printed with flame-retardant ink, he had no familiarity with the composition of the logo affixed to Ailsa's sweatshirt, and he had no opinion as to whether the logo had contributed to the sweatshirt's ignition or its rate of burn. Dr. Colver also testified that he had no idea whether flame-retardant ink is readily obtainable or widely used by silk-screeners on any garments other than children's sleepwear. Again, the district court did not abuse its discretion in paring testimony that Dr. Colver was not competent to offer. See General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997).

Exclusion of the Expert Videotapes

After remand of the case to the district court, a revised discovery schedule set a deadline for plaintiff's expert disclosures of November 1, 1997, and for completion of all discovery by July 1, 1998, in anticipation of a July trial date (later continued to October and then to April 6, 1999).[14] On August 12, 1998, plaintiff produced to defendants a videotape prepared by Dr. Charles Beroes, a chemical engineer retained by

_____

[14]It is undisputed that plaintiff never requested an extension of either of the relevant deadlines.

plaintiff as an expert witness. On January 14, 1999, a second videotape materialized, prepared by another of plaintiff's designated experts, Gordon Damant.[15] While plaintiff's brief is not terribly informative about the contents of the two videotapes, it does state that "[t]he tapes show graphically and in real time the CS 191-53 apparatus and it's [sic] operation, the sudden and dramatic flare-up of the sweatshirt sample when ignited, the fact that cotton/polyester does melt and drip, that newspaper does pass the CS 191-53 standard and that flame retardant cotton is a reality."[16] At trial, Union and Sharky's objected *inter alia* to the belated disclosure of the videotapes. The district court, pursuant to Rule 37(c)(1), struck the videotapes as exhibits.[17]

According to Rule 26(e)

_____

[15]Both Dr. Beroes and Damant were deposed by defendants. At the depositions, neither Dr. Beroes or Damant indicated an intention to prepare any additional videotape (other than a mannequin demonstration tape) to illustrate trial testimony.

[16]CS (Commercial Standard) 191-53 is the federal flammability standard for textiles, 16 C.F.R. part 1610.

[17]Another videotape showing mannequin demonstrations of burning sweatshirts, which had been timely disclosed, was excluded by the district court in an October 26, 1998 pretrial ruling as scientifically unreliable because of its failure to replicate in any meaningful way the known facts of Ailsa's accident. See Bogosian v. Mercedes-Benz of North America, Inc., 104 F.3d 472, 479-480 (1st Cir. 1997). Plaintiff has not appealed this ruling.

[a] party who has made a disclosure under subdivision (a) or responded to a request for discovery with a disclosure or response is under a duty to supplement or correct the disclosure or response to include information thereafter acquired if ordered by the court or in the following circumstances:

(1) A party is under a duty to supplement at appropriate intervals its disclosures under subdivision (a) if the party learns that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing. With respect to testimony of an expert from whom a report is required under subdivision (a)(2)(B) the duty extends both to information provided through a deposition of the expert, and any additions or other changes to this information shall be disclosed by the time the party's disclosures under Rule 26(a)(3) are due.

In 1993, the Federal Rules were amended to add Rule 37(c)(1), which as it appeared at the time of trial, stated in relevant part that "[a] party that without substantial justification fails to disclose information required by Rule 26(a) or Rule 26(e)(1) shall not, unless such failure is harmless, be permitted to use as evidence at trial . . . any . . . information not so disclosed."[18]  The amendment gave teeth to a significantly broadened duty to supplement Rule 26 disclosures

---

[18]Rule 37(c)(1) was further amended in 2000 to make clear that a party's failure to comply with the supplementation duty imposed by Rule 26(e)(2) was also sanctionable.

by making mandatory preclusion "the required sanction in the ordinary case." Klonski v. Mahlab, 156 F.3d 255, 269 (1st Cir. 1998).

The authority of a trial court to exclude an exhibit that is untimely produced under the deadlines set by a case management order was well-established before the 1993 amendment to the Rules.[19] Fusco v. General Motors Corp., 11 F.3d 259, 265 (1st Cir. 1993) Indeed, we held in Fusco (a pre-amendment case) that the duty of a party to seasonably supplement its disclosures under Rule 26(e) "carries with it the implicit authority of the district court to exclude such materials when not *timely* produced even if there was no rigid deadline for production." See also Williams v. Monarch Machine Tool Company, Inc., 26 F.3d 228, 230 (1st Cir. 1994).

We are unpersuaded by plaintiff's contentions that the disputed videotapes were offered not "as reenactments but as illustrations of scientific principles" and that under Fusco her

[19]In an October 16, 1998 pretrial order, the district court gave the parties until November 13, 1998, to supplement their expert disclosures "solely with respect to the bases and reasons for previously disclosed expert opinions." The court also admonished the parties that "[n]o new expert opinions shall be disclosed as part of the supplemental disclosures." The Damant videotape was produced well after this deadline. The Beroes tape, while it was produced prior to November 13, 1998, appears from plaintiff's cursory description to have far exceeded the scope of the supplementation permitted by the court.

-19-

experts "were clearly permitted to proceed in the manner they did to prepare their presentation prior to trial." The first contention parrots our acknowledgment of a similar argument made by the defendant in <u>Fusco</u> and our comment that "[s]cientific principles, when demonstrated in a fairly abstract way, are quite unlikely to be confused with the events on trial." <u>Fusco</u>, 11 F.3d at 264 n.5. However, we upheld the trial court's exclusionary ruling in <u>Fusco</u> because the videotape at issue was not sufficiently close in appearance to the circumstances of the actual accident to avoid the risk of confusion on the part of the jury. Based on what plaintiff tells us of the content of the videotapes in dispute here, we affirm the district court's ruling for the same reason. The second statement is apparently based on our observation in <u>Fusco</u> that "experts, like lawyers themselves, may increase their efforts as trial approaches, and we do not suggest any general bar to an exhibit created in good faith for the expert after initial discovery." <u>Id</u>. at 266. Nevertheless, we also noted that "where a discovery request for the expert's materials has been made, the later attempt to add new exhibits designed for the expert's use at trial is subject to reasonable supervision by the trial judge." <u>Id</u>. This is particularly the case where, as here, the district court was entitled to find that the sweeping and argumentative content of

the disputed videotapes "would have compromised [defendants'] pretrial preparations and that the supplementation came too late to be `seasonable.'" Id.

Perhaps recognizing that the powers of a district court to enforce its case management orders and the supplementation duties imposed by Rule 26 will not lightly be disturbed, plaintiff argues that the court erred in not personally viewing the tapes "to see whether or not they offend[ed]" Rule 26 before entering its ruling.[20] The short answer is that Rule 37(c)(1), which requires the near automatic exclusion of Rule 26 information that is not timely disclosed, imposes no such obligation on the trial court. Rather it is the obligation of the party facing sanctions for belated disclosure to show that its failure to comply with the Rule was either justified or harmless and therefore deserving of some lesser sanction. See Heidtman v. County of El Paso, 171 F.3d 1038, 1040 (5th Cir. 1999); Salgado by Salgado v. General Motors Corp., 150 F.3d 735, 741-742 (7th Cir. 1998). This is a burden that plaintiff made no attempt to shoulder, and the district court did not abuse its

[20]We find no indication in the record that plaintiff ever requested that the court view the videotapes before making its ruling. We do not suggest that a district court has a duty to do so in the face of a belated request, although we would not discourage a trial court from undertaking such a viewing should similar circumstances arise.

discretion in imposing Rule 37(c)(1)'s "self-executing" sanction. See Advisory Committee Notes to the 1993 Amendments.

The Verdict Slip

Question one of the special verdict slip asked the jury whether it found the sweatshirt and t-shirt to have been defectively designed. The jury answered "no," and following the slip's instructions, concluded its deliberations. Plaintiff argues that question one, by pretermitting the jury's deliberations, unfairly removed the issue of Union's alleged negligence from the jury's consideration. The gist of plaintiff's contention is that "[i]t was perfectly possible for the jury to find that the sweatshirt and t-shirt were reasonably safe as designed and manufactured by Union but the Union should, in the exercise of due care, have avoided selling the garments into the childrens' [sic] market."

Whatever the substantive merits of plaintiff's "negligent marketing" theory, it was never cogently advanced at trial. Without objection, the district court instructed the jury on plaintiff's claim that Union was negligent "when it designed the garments in question . . . and that the defendant's negligence resulted in certain defects [that caused or contributed to plaintiff's injuries]." The district court was not asked to, nor did it volunteer to instruct on a theory of

-22-

"negligent marketing."  While plaintiff's counsel obliquely raised the issue in objecting to the composition of the verdict slip,[21] counsel made no objection to the omission of an instruction on "negligent marketing."  It is settled law that a party who fails to lodge a proper objection to an omitted jury instruction waives the issue on appeal.  Fed.R.Civ.P. 51 ("No party may assign as error the giving or failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict"); Poulin v. Greer, 18 F.3d 979, 982 (1st Cir. 1994) (counsel's failure to object to the omission of a requested jury instruction waived the issue on appeal).  While plaintiff makes the passing point that Union "never contested" the appropriateness of selling an adult-sized sweatshirt to be worn by a twelve year old girl, that is explained by the fact that the issue was never raised at trial, and only blossomed on appeal.

Limitations on Expert Medical Testimony

---

[21]Counsel's objection was as follows:

I think that precludes the jury from considering my allegations of negligence, which is found in Count II of my original complaint, dealing with marketing and selling of the sweatshirts in question.  And by the language of the special verdict form and the order of deliberations it precludes the jury from considering those aspects of our claim.

Plaintiff next complains that the district court abused its discretion in limiting the testimony of Dr. Ramsey Choucair. Dr. Choucair was one of Ailsa's treating physicians whose testimony was submitted by way of a videotaped deposition. The majority of defendants' objections to Dr. Choucair's testimony were overruled, although the court struck the answer to the question: "[W]hen something melts on skin, do you have an opinion as to whether that burn is deeper?" Dr. Choucair testified that the severity of a burn generally depends on the duration of the skin's contact with the flame and the flame's intensity. However, he prefaced his answer with a disclaimer.

> My experience with treating patients who have burn scars over different parts of their body is that when someone's history implies that whatever was stuck to their skin, whatever it may be, whether it was part of clothing or external environment that was burning and stuck to their skin, the burn tends to be deep. Is it deeper than it would have been otherwise? *It's impossible to know*. . . . (Emphasis added).

The reason for Dr. Choucair's hesitancy became apparent a few minutes later when plaintiff's counsel sought to elicit an opinion from Dr. Choucair as to whether a burn from a fabric that melts on the skin would be more severe than a burn from a fabric that "ashes." Dr. Choucair qualified his reply by stating: "[T]hat's clearly not my area of expertise." There can

be no error in excluding the opinion of an expert witness that he candidly admits  is beyond his competence.[22]

Catch-All Arguments

Under a caption objecting to limitations placed by the district court on the pretrial discovery and the trial presentation of evidence relating to the failure to warn claim, plaintiff repeats many of her earlier arguments, while listing a potpourri of largely extraneous topics that she wishes the court had allowed her to develop more fulsomely at trial, ostensibly to show Union's "superior knowledge" of the danger its products posed to children.  They include: (1) the court's refusal to admit as an exhibit a 1972 report by the Secretary of the Department of Health, Education and Welfare calling attention to the fact that burn injuries caused by the accidental ignition of clothing "strike disproportionally at the young and the elderly"; (2) the court's refusal to admit evidence that a senior Union executive was "surprised" to learn that a 1979 burn accident involving a child's blended cotton/polyester shirt was caused by heat from a camera lamp;

---

[22]Dr. Choucair's testimony on this point, even if admissible, would have been cumulative of the testimony of Dr. Beroes, who testified to the risks posed by fabrics that melt on the skin.  The district court, in its pretrial order, had cautioned the parties that it would not permit the repetition of similar opinions by successive expert witnesses.

(3) the court's refusal to permit plaintiff to make "proper use" at trial of evidence of prior burn accidents involving children's wear manufactured by Union; (4) the court's refusal to permit plaintiff to take a deposition of Union's in-house counsel regarding these prior occurrences; (5) the court's refusal to permit a belated deposition of the "warnings expert" retained by Union (who did not testify at trial); (6) the court's tentative refusal to admit a 1989 Rhode Island telephone survey suggesting "that consumers are, in fact, not as aware of the flammability of their clothing as one might suspect"; (7) the court's refusal to admit evidence that the garment industry had lobbied against any strengthening of the FFA flammability standard; (8) the court's refusal to permit testimony that a Union official was aware of an article written by an expert witness friendly to the garment industry advocating the placing of  warning labels on adult clothing; and (9) the court's refusal to permit Dr. Colver to testify that such warnings are an inherent feature of competent design.  According to plaintiff, the cumulative effect of these restrictive rulings was to deprive her of the opportunity to argue for an award of "enhanced compensatory" damages.[23]

---

[23]We find this argument particularly puzzling as the jury found no basis for awarding any damages at all, much less an award of enhanced damages.

We have examined each of the alleged errors that can be located in the record and find no error.[24] The bulk of the material excluded or restricted by the district court consisted of stale hearsay and largely irrelevant and prejudicial meanderings. Plaintiff's allegation that the district court prohibited her from making "proper use" of prior burn accidents involving Union's blended cotton/polyester garments deserves comment only because of the extent to which plaintiff's brief unfairly characterizes the rulings of the district court. In an order issued two months prior to trial, the court *denied* Union's motion to exclude all evidence of prior burn accidents involving Union garments. In a considered application of the Rule 403 balancing test, the court held that "[t]o the extent the issue of whether Union had notice that 50/50 blend fabric could burn and cause serious injury or that common household sources could ignite the garments remains in the case at trial, evidence of prior accidents showing those circumstances and involving Union garments made of 50/50 fabric will be relevant." The court, however, also held that because the issue was one of general notice, plaintiff would not be permitted to introduce evidence of the prejudicial details of these prior accidents,

---

[24]An appellate court will not scour the record for claims of error that an appellant fails to properly identify. Lemelson v. United States, 752 F.2d 1538, 1553 (Fed. Cir. 1985).

particularly the gruesome photographs she had assembled of horribly burned children. The use of the prior accidents authorized by the district court was, in our judgment, a fair and reasonable application of Rule 403.[25]

**Affirmed.**

---

[25]Plaintiff's final contention, that the district court erred in refusing to permit her to argue an *ad damnum* to the jury, merits no discussion. It would have been reversible error for the court to have allowed such argument. <u>Davis</u> v. <u>Browning-Ferris Industries, Inc.</u>, 898 F.2d 836, 837-838 (1st Cir. 1990).