469 F.3d 284
 DESIGN STRATEGY, INC., Plaintiff-Counter-Defendant-Appellant,
v.
Marc E. DAVIS, Defendant-Counterclaimant-Appellee,
Info Technologies, Inc., Info Technologies Web Solutions, Inc., and John Goullet, Defendants-Appellees.
Docket No. 05-4909-CV.
 United States Court of Appeals, Second Circuit.
 Argued: June 19, 2006.
 Decided: October 19, 2006.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Jack S. Dweck, Dweck Law Firm, LLP, New York, NY, for Plaintiff-Counter-Defendant-Appellant.
 Leonard Benowich, Roosevelt & Benowich, LLP, White Plains, NY, for Defendant-Counterclaimant-Appellee.
 R. Scott Garley (Mark W. Stoutenburg, on the brief), Gibbons, Del Deo, Dolan, Griffinger & Vecchione, P.C., New York, NY, for Defendants-Appellees.
 Before: MINER and CALABRESI, Circuit Judges, and HOLWELL, District Judge.[1]
 MINER, Circuit Judge:
 
 
 1
 Plaintiff-counter-defendant-appellant Design Strategies, Inc. ("Design") appeals from a judgment entered in the United States District Court for the Southern District of New York (Marrero, J.). The action arises out of the alleged diversion of a corporate opportunity by defendant-counterclaimant-appellee Marc E. Davis ("Davis") during the course of his employment with Design. According to Design, the corporate opportunity was diverted to defendant-appellee Info Technologies Web Solutions ("IT Web"), with the collusion of defendants-appellees Info Technologies, Inc. ("Infotech") and John Goullet ("Goullet"), Chief Executive Officer of both Infotech and IT Web (collectively, the "IT Defendants"). Davis was employed by IT Web following the alleged diversion.
 
 
 2
 The District Court, in an order dated April 27, 2005, precluded Design from presenting evidence in support of its claim for lost profits, pursuant to Fed.R.Civ.P. 37(b), on the ground that it had not disclosed the computation of those lost profits, as required by Fed.R.Civ.P. 26(a)(1)(c). In that same Order, the District Court also rejected a demand by Design for a jury trial, the District Court having found that all of Design's remaining claims were "equitable" and therefore that no jury trial right existed. Following a bench trial, the District Court concluded, in an Order dated August 11, 2005, that Davis (a) had not diverted a corporate opportunity; (b) had not engaged in unfair competition; (c) had breached a fiduciary duty of loyalty, requiring the forfeiture of four weeks of salary; (d) was not liable for overpaid commissions; and (e) had not been unjustly enriched; and that (f) the IT defendants had not aided and abetted Davis's breach of fiduciary duty; and (g) a claim for punitive damages was unsupported.
 
 BACKGROUND
 I. The Factual Framework
 
 3
 Design is in the business of providing trained personnel to companies needing technical support on specific projects requiring computer technology services. Design hires individuals on a contract basis as needed per project and then assigns those individuals to work at a Design client's site under the client's supervision and on the specific temporary projects and duties determined by the client. This aspect of the computer technology industry is known as "staffing." Design also claims to be involved in the "solutions" aspect of the industry — the provision of "the services of trained personnel employed by [Design] on its premises and using the computers and other technical equipment supplied at [Design's] laboratory on specific projects to design and develop websites for clients in accordance with given specifications."
 
 
 4
 Marsh Newmark is the President of Design and has been its sole director and shareholder since the company's founding in 1980. Newmark hired Davis in 1987 to work for Design as a Sales Representative and later as Sales Manager. Davis was an at-will employee without a written agreement and was not subject to any restrictive covenant of confidentiality, non-competition, or non-solicitation. From 1998 though February 2000, Davis earned an annual salary of $85,000. Davis's commissions in the last four calendar years of his employment at Design (1997-2000) were $512,333; $434,212; $285,947; and $73,119, respectively.
 
 
 5
 Sometime during the summer of 1999, Davis was advised by Frank Murphy, a senior employee and one of his business contacts at Microsoft, Inc., that Microsoft was cooperating with an entity known as Brill Media ("Brill") in a venture that would entail the solicitation of companies for participation in a $10-million computer technology project. The project, which came to be known as Contentville.com ("Contentville"), called for the creation of a high-profile website, powered by Microsoft software, to engage in electronic commerce in books and related products in competition with similar businesses operated by Amazon.com and BarnesandNoble.com. The company ultimately chosen to work on Contentville would be required to provide "solutions" work.
 
 
 6
 Design contends that Davis, while still employed at Design, diverted this corporate opportunity from Design to IT Web and subsequently benefitted from that diversion by accepting an offer of employment with IT Web. Design also contends that IT Web and its sister company, Infotech, along with Goullet, colluded with Davis to divert the Contentville corporate opportunity away from Design and ultimately hired Davis. Moreover, Design argues that Davis was paid a "bounty" in the form of a 50% commission on the Contentville contract once he was hired by IT Web. Davis responded that he notified Design of the Contentville corporate opportunity first and referred IT Web to Microsoft only after Newmark indicated that he was not interested in the project and after Microsoft and Brill made it clear that a "staffing" company like Design would not be qualified to work on the Contentville project.
 
 II. Proceedings in the District Court
 
 7
 Design filed its Complaint on July 11, 2002, pleading claims against Davis for breach of employment agreement, breach of fiduciary duties, unfair competition, and unjust enrichment. Design pleaded claims against the IT Defendants for aiding and abetting a breach of fiduciary duty, wrongful inducement of a breach of fiduciary duty, and interference with employment. Design also pleaded a claim of conspiracy to breach fiduciary duties against both Davis and the IT Defendants. Design sought several forms of relief. First, Design sought injunctive relief against Davis and others to preclude Davis from: (a) using Design documents containing confidential information; (b) soliciting any business from a client of Design that Davis had contact with at Design; and (c) competing with Design. Design also sought the imposition of a constructive trust on all revenues that all defendants derived from the alleged breach of fiduciary duty, as well as restitution and exemplary damages from Davis. Finally, Design sought "damages" "in an amount to be determined at trial."
 
 
 8
 Following the completion of discovery, the parties cross-moved for summary judgment. The District Court, in a Decision and Order, dated June 22, 2004, found "that the record in this case raises issues of material fact with regard to whether Contentville was a corporate opportunity for Design, whether Davis breached his fiduciary duty to Design, and whether the IT Defendants knew or should have known about Davis's alleged breach." Specifically, the District Court found, in regard to Design's claims of breach of fiduciary duty, unfair competition, unjust enrichment, aiding and abetting a breach of fiduciary duty, and wrongful inducement of a breach of fiduciary duties, that there were genuine issues of material fact as to whether Contentville, absent Davis's alleged breach, could have been awarded to Design (i.e., whether Contentville was a "corporate opportunity") and whether, and to what extent, Davis informed Design and Newmark about Contentville (i.e., whether Davis breached his fiduciary duty). The District Court determined, however, that no claim arising from the alleged breach of employment agreement could be made out because "there was no written agreement covering Davis's employment" nor was there any support for finding an oral agreement between Design and Davis. Finally, the District Court found that no claim for conspiracy to breach a fiduciary duty could be proven because some of the parties to the alleged breach — specifically, the IT Defendants — did not independently owe a duty to Design.
 
 
 9
 In a subsequent Order, dated February 16, 2005, responding to the motion by Davis and the IT Defendants to strike Design's jury demand, the District Court found:
 
 
 10
 [T]o the extent that Design seeks monetary damages for the alleged misappropriation of a corporate opportunity and diversion of corporate assets in the form of the legal remedy of lost profits, in other words, corporate revenues Design would have earned out of its business operations but for Defendants' alleged wrongful conduct, it is entitled to a trial by jury. The Court finds that Design is not, however, entitled to a trial by jury on any claims with respect to which it seeks only the equitable remedies of disgorgement of profits, restitution, the imposition of a trust, an accounting, exemplary damages, or permanent injunction.
 
 
 11
 In an Order dated April 27, 2005, responding to the motion by Davis and the IT Defendants to preclude Design from introducing evidence of its alleged lost profits at trial, the District Court found that "Design [had] not provided sufficient discovery regarding the amount of or basis for calculating damages based on alleged lost profits to enable it to seek those damages at trial." In accordance with its Order of February 16, the District Court therefore held that Design was not entitled to a jury trial, because lost profits were the only "compensatory damages" that it had sought, and the remainder of its remedies were equitable. The court then determined that "the central issue for trial is whether or not Davis provided Design with sufficient notice of and opportunity to compete for a contract with Microsoft."
 
 
 12
 The case proceeded to a bench trial, after which the District Court made findings of fact and conclusions of law in a Decision and Order dated August 11, 2005. The District Court found, based on the testimony of Murphy and Davis, that Davis initially sought to procure the Contentville contract for Design from the time he learned about it until sometime in November 1999. The District Court also found that Davis had informed Newmark about the Contentville opportunity but that "Newmark apparently was at best ambiguous about making the necessary initial capital investment[] and that it was not until much later, when Davis believed that Design was not prepared to pursue the Contentville business under the terms established by Microsoft, that Davis turned to IT Web."
 
 
 13
 The District Court found that "in or before early November 1999, Davis ceased attempting to solicit the Contentville contract for Design and, instead, commenced trying to promote IT Web for the contract." The District Court further found that Davis took the additional steps of contacting and/or attempting to contact Microsoft employee John Gomez ("Gomez") directly on numerous occasions in late November and early December 1999 to encourage him to consider IT Web for the Contentville contract. And, most importantly, the District Court found that Design "would not have obtained the Contentville contract even if Davis had not promoted IT Web." The District Court reasoned that this was so because Design "did not satisfy the vendor requirements Microsoft and Brill had established" or "the readiness timetable Microsoft sought with regard to the Contentville contract." According to Gomez, "prior web solutions business experience and an operational computer lab were firm requirements," and Design lacked the experience and the operational capacity to fulfill those requirements.
 
 
 14
 Microsoft awarded the Contentville contract to IT Web in mid-December of 1999. IT Web extended an offer of employment to Davis by letter dated December 14, 1999, which Davis accepted in January 2000. Davis began working for IT Web in early February 2000. The District Court determined that, although Davis had first interviewed for a position with the IT Defendants on September 22, 1999, there was "no evidence that the IT Defendants encouraged Davis to provide them with information concerning the Contentville contract, or that they in any way affirmatively sought his assistance in obtaining it." Additionally, the District Court found that no "Infotech or IT Web officer[] ever offered Davis a job or payment in exchange for referral of the Contentville business or other information about opportunities with Microsoft." Finally, the District Court found that, although Infotech was a competitor of Design in the "staffing" aspect of the web business, IT Web and Design were not competitors in the "solutions" aspect of the business because "Design had no substantial competence or volume of business in providing web solutions." Indeed, the District Court found that, between 1997 and 2000, 99.5% of Design's revenue came from "staffing" services.
 
 
 15
 Based on the foregoing findings, the District Court found that Contentville was not a "corporate opportunity" for Design because "Design would [not] have been able to meet Microsoft's demands for the project," Newmark had "refused to take tangible steps necessary to" expand Design's business to include providing "solutions" services, and because Davis had "initially promoted Design" for the Contentville contract. The District Court also found that claims sounding in "unfair competition" were not sustained because "Design [had] not presented sufficient evidence to demonstrate that the Contentville contract represented a benefit or property right that `belonged' to it in any real or legal sense" and because "the record does not support a finding that during the period of his employment Davis set himself up to engage in competition with Design on his own, or that he did so in a `conspiracy' with others."
 
 
 16
 Similarly, the District Court found that recovery for unjust enrichment was not warranted because Davis was not "enriched" by a "misappropriation and use of a tangible benefit or property that belonged to Design," because "Contentville did not constitute a corporate opportunity for Design," and because Design would not have been awarded the Contentville contract notwithstanding Davis's disloyalty. "As a result, there is no basis on which to find that Davis's misconduct was at Design's expense."
 
 
 17
 The District Court, however, did find that Davis had breached his fiduciary duty to Design by being "disloyal" to his employer. The District Court found that "Davis's advocacy on behalf of IT Web as a partner with Microsoft for the Contentville project was inconsistent with his duty of loyalty to Design." The District Court determined that "[i]n order for Davis's efforts to advance IT Web's prospects as regards the Contentville opportunity to constitute a breach of his duty of loyalty to Design, it must further be established that Design and IT Web were competitors." Although the District Court had already found that IT Web and Design were not competitors in the "solutions" aspect of the business, the District Court, relying on Elco Shoe Mfrs., Inc. v. Sisk, 260 N.Y. 100, 103-04, 183 N.E. 191 (1932), noted that "even if strictly speaking Design and IT Web were not themselves competitors in the web solutions niche of the computer industry, they had sufficiently conflicting business interests at the relevant time to be deemed competitors in the present context." The District Court also emphasized that Davis had, at the time he began promoting IT Web to Microsoft, already interviewed for a job there, and thus, "he had strong personal reasons and business incentives for IT Web to be selected by Microsoft for the Contentville services."
 
 
 18
 Having determined that Davis violated his duty of loyalty, the District Court turned to the question of remedy. Relying on this Court's reasoning in Phansalkar v. Andersen Weinroth & Co., L.P., 344 F.3d 184 (2d Cir.2003), the District Court determined that forfeiture of salary earned "during the period of disloyalty" was the appropriate remedy. Specifically, the District Court reasoned that New York law requires "forfeiture of salary earned during a period of disloyalty, but not during periods of loyal employment that may follow the period of disloyalty." Moreover, relying on Phansalkar and Musico v. Champion Credit Corp., 764 F.2d 102 (2d Cir.1985), the District Court found that Davis would not be required to forfeit any commissions earned, even during the period of disloyalty. The District Court fixed Davis's period of disloyalty from mid-November of 1999, when he first began to promote IT Web to Microsoft, to early-December of 1999, when he ceased making contact with Microsoft. The District Court fixed exact dates of November 11 to December 9, 1999, calculated that Davis had earned $6,538.00, exclusive of commissions, during this period, and set that amount for forfeiture.
 
 
 19
 The District Court, however, refused to award punitive damages in connection with Davis's disloyalty because there was
 
 
 20
 no evidence in the record to support a finding of the level of extreme moral culpability necessary for an award of punitive damages. In this regard, the [c]ourt considers particularly compelling its finding that Davis initially sought to procure the Contentville project solutions work for Design, that he informed Newmark about the opportunity and Newmark apparently was at best ambiguous about making the necessary initial capital investment, and that it was not until much later, when Davis believed that Design was not prepared to pursue the Contentville business under the terms established by Microsoft, that Davis turned to IT Web.
 
 
 21
 The District Court found, in relation to Design's claim that Davis was "overpaid commissions" on a wholly separate deal with Merill Lynch while at Design, that "Design did not plead this claim in its complaint or include it in its initial disclosures, nor has it offered any legal theory on the basis of which the Court could sustain such a claim. Accordingly, Design's claim for overpaid commissions is dismissed."
 
 
 22
 Finally, the District Court refused to award attorneys' fees because Design had "not cited, nor [was] the Court aware of, any . . . basis," such as an "agreement between the parties, statute, or court rule," "on which to award attorneys' fees in this case."[2]
 
 
 23
 Judgment was entered on August 18, 2005. Design filed a Notice of Appeal on September 8, 2005. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.
 
 ANALYSIS
 I. Exclusion of Lost Profits Evidence
 
 24
 A. On October 22, 2002, Design filed its Initial Disclosure, as required by Rule 26(a)(1) of the Federal Rules of Civil Procedure. Design listed as claimed "damages":
 
 
 25
 1. All monies paid to Marc Davis for salaries based upon breach of fiduciary relationship with Plaintiff.
 
 
 26
 2. All monies earned by Marc Davis as a result of unlawful diversion of business from Design Strategy to the corporate Defendants.
 
 
 27
 3. All profits earned by the Defendants as a result of the unlawful diversion of business from the Plaintiff to the Defendants, which business was generated with Microsoft Corporation.
 
 
 28
 4. Attorneys' fees for the prosecution of this action.
 
 
 29
 5. Punitive damages.
 
 
 30
 6. Interest costs and disbursements.
 
 
 31
 The IT Defendants' First Set of Interrogatories and Request for the Production of Documents, dated November 5, 2002, requested a statement
 
 
 32
 in detail [of] each financial expense or loss allegedly incurred by plaintiffs as a result of any acts or omissions of [the] IT Defendants in this action[,] giving:
 
 
 33
 (a) a description of its nature;
 
 
 34
 (b) the amount;
 
 
 35
 (c) the date incurred; (d) the amount of similar estimated future expenses or losses, if any.
 
 
 36
 Design responded to this request on March 26, 2003, repeating the language of its Initial Disclosure, and adding the descriptive category of "[l]oss of sale of Design Strategy," under which it affixed various "not less than" amounts for each descriptive category of claimed "damages."
 
 
 37
 Well after the close of discovery, in a proposed pretrial order submitted shortly before trial, Design disclosed two witnesses — one of whom it disclosed as an expert witness — to testify regarding Design's "lost profits." The defendants filed a motion in limine to preclude Design from offering these witnesses or any other evidence of its lost profits on the ground that "lost profits" had not been listed as a category of claimed damages in Design's Initial Disclosure or at any point during discovery, and thus, the offering of evidence or testimony as to "lost profits" was in violation of Rules 26(a)(1)(c) and (a)(2). The District Court held a telephone conference on April 5, 2005, to resolve objections to these two witnesses and to resolve "a question concerning the evidence of lost profits and the extent to which damages can be proven in" this case. The District Court noted that
 
 
 38
 although Design indicated that it might seek lost profits by referring to lost revenues in the first cause of action in the [C]omplaint for breach of employment agreement and thereby arguably put the defendants on notice that lost profits might be sought, Design has not provided any specific computation of lost profits nor provided any evidence on the basis of which such computation might be made.
 
 
 39
 The District Court's written Order of April 27, 2005 further explained that Design's Initial Disclosure Statement, though describing the damages it sought with some specificity, did not mention lost profits. The District Court ruled that Design's failure to abide by Fed.R.Civ.P. 26(a)(1)(c) meant that evidence of lost profits would not be admissible.
 
 
 40
 Design objected that it had, in fact, turned over evidence from which a computation of damages could be made — its financial records. When pressed, Design argued that it was not obligated to provide a calculation of damages because the calculation of damages from these records would be "simple arithmetic" — "If our revenue is $100 and our expenses are $50, then we have a 50 percent profit margin, and that is the basis on which I would have our people testify." The District Court corrected Design, noting that Rule 26 required more of plaintiffs:
 
 
 41
 THE COURT: Mr. Dweck [Design's counsel], it is not as simple as simply providing the [financial statements] to the defendant without your providing as well a specific formula indicating how your theory of damages is supported. That is not something that the defendant is in a position to do for you.
 
 
 42
 The only way that you can establish that you suffered damages is to be able to set it forth in some theory and then support the theory with facts. Simply providing documents to the defendant and assuming that somehow the defendant will divine what your alleged lost profits are by having documents is not sufficient. This Court on that basis is persuaded that this record does not support that theory.
 
 
 43
 MR. DWECK: . . . I didn't think we were obligated to do their homework.
 
 
 44
 THE COURT: It is quite the opposite, Mr. Dweck. You, the plaintiff, are the one[] who [is] asserting the damages. If you assert the damages and you claim that you suffered a certain amount of injury, it is for you, you have the burden of proof on injury and the amounts thereof, and they have to be calculated with reasonable certainty. So your saying that you provided documents to the defendant doesn't go far enough in meeting your burden of proof on this issue.
 
 
 45
 In its written Order of April 27, 2005, the District Court again found that Design had not complied with Rule 26. The District Court determined that "Design has not provided any justification for its failure to disclose information regarding the amount of, or basis for computing, its alleged lost profits," noting specifically Design's failed argument at the telephone conference. The District Court further found that this failure was not harmless because discovery had been closed since October 2003 and because the trial date had already been postponed in part at Design's request. Accordingly,
 
 
 46
 reopen[ing] discovery for purposes of investigating the subject of lost profits would inevitably result in further substantial delays in the resolution of this case and impose additional costs on Defendants. Defendants would thus be harmed if the [c]ourt were to permit Design to pursue a lost profits theory of damages, in that Defendants would be required either to postpone a trial for which they are otherwise prepared and which has already been significantly delayed, or proceed without having had the opportunity to conduct adequate discovery on this issue.
 
 The District Court also noted that
 
 47
 "[i]n violating Rule 26(a)(1)(c), Design has also failed to provide the [c]ourt with any basis on which to determine whether or not its alleged lost profits are "capable of measurement based upon known reliable factors without undue speculation," Ashland Mgmt. Inc. v. Janien, 82 N.Y.2d 395, 403, 604 N.Y.S.2d 912, 624 N.E.2d 1007 (1993), as New York law requires. The absence of any basis on which to make this determination further supports the [c]ourt's holding that Design may not pursue a lost profits theory of damages at trial."
 
 
 48
 In a lengthy footnote, the District Court determined that it lacked discretion to decline to impose sanctions pursuant to Rule 37(c)(1). Specifically, the District Court held that
 
 
 49
 the plain language of Rule 37(c)(1), indicate[s] that, while trial courts have discretion to determine whether or not a substantial justification exists and whether or not a failure to disclose is harmless, if the trial court finds that there is no substantial justification and the failure to disclose is not harmless, preclusion is mandatory.
 
 
 50
 B. A district court has wide discretion to impose sanctions, including severe sanctions, under Federal Rule of Civil Procedure 37, and its ruling will be reversed only if it constitutes an abuse of discretion. See Patterson v. Balsamico, 440 F.3d 104, 117 (2d Cir.2006) ("This Court reviews the district court's exclusion of testimony under Rule 37(c)(1) for abuse of discretion."); Daval Steel Products, a Div. of Francosteel Corp. v. M/V Fakredine, 951 F.2d 1357, 1365 (2d Cir.1991) (discussing discretion under Rule 37(b)(2)). "A district court `abuses' or `exceeds' the discretion accorded to it when (1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision — though not necessarily the product of a legal error or a clearly erroneous factual finding — cannot be located within the range of permissible decisions." Zervos v. Verizon New York, Inc., 252 F.3d 163, 169 (2d Cir.2001) (footnote omitted).
 
 
 51
 Design argues that it was not in violation of Rule 26(a)(1)(c) because "[i]n the instant action there was no direct order to the Plaintiff to calculate damages. The simplicity of taking Design's revenue and deducting the cost of operations from the financial statements would have yielded the gross profits." This is a misstatement both of the facts of this case and of Rule 26(a)'s requirements.
 
 
 52
 Rule 26(a)(1)(c) of the Federal Rules of Civil Procedure provides that
 
 
 53
 a party must, without awaiting a discovery request, provide to other parties: . . . a computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered . . . . (emphasis added).
 
 
 54
 The District Court's finding that Design had failed to comply with this rule was well within the proper range of its discretion.
 
 
 55
 First, as correctly noted by the District Court, nowhere did Design ever disclose "lost profits" as even a "category" of "damages" sought on its Initial Disclosure Statement. Although Design's Complaint does include a generic reference to "damages" in its Initial Disclosure, Design omitted any reference to its own lost profits as a measure of recompense, focusing instead on "monies earned" by the defendants. Moreover, the Record does not reflect any supplemental disclosures as required by Rule 26(e) of the Federal Rules of Civil Procedure. The defendants were, therefore, without notice that such claims would be an issue until they were provided, shortly before the commencement of trial, with the names of two witnesses who would testify as to lost profits.
 
 
 56
 Second, by its very terms Rule 26(a) requires more than providing — without any explanation — undifferentiated financial statements; it requires a "computation," supported by documents. The need for computation and supporting documents is especially necessary in a case like this, where the damages claim is for lost profits from a project of a type with which the plaintiff had little-to-no prior experience. Design's "simple arithmetic" calculation is wholly inadequate as a measure of damages, given that it is undisputed that, in order to perform on the project, Design would have had to establish an entirely new computer lab and hire all new personnel in the space of two weeks. At the late point in the proceedings when Design disclosed that it would be presenting lost-profits witnesses, much greater detail than previously provided would have been necessary to satisfy Rule 26(a). See City & County of San Francisco v. Tutor-Saliba Corp., 218 F.R.D. 219 (N.D.Cal.2003) (recognizing that Rule 26(a)(1)(c) anticipates supplemental disclosures with ever-greater level of detail as discovery progresses).
 
 
 57
 Third, Rule 26(a) requires a party to provide a computation of any category of damages voluntarily, i.e., "without awaiting a discovery request"; Design's failure to comply with this requirement was especially troubling because, as noted by the District Court, the IT Defendants specifically requested a calculation of damages.
 
 
 58
 Fourth, Rule 26(a) requires a party — in addition to providing a calculation of damages — to make "available for inspection and copying as under Rule 34 the documents or other evidentiary material . . . on which such computation is based." The Advisory Committee Notes to Rule 26(a)(1)(c) accompanying its promulgation make clear that the rule "imposes a burden of disclosure that includes the functional equivalent of a standing Request for Production under Rule 34. A party claiming damages or other monetary relief must, in addition to disclosing the calculation of such damages, make available the supporting documents for inspection and copying as if a request for such material had been made under Rule 34." Fed. R.Civ.P. 26 Advisory Committee Notes to 1993 Amendments. Design failed to disclose both a calculation of damages and the documents supporting that calculation.
 
 
 59
 Design next argues that, even if it did violate Rule 26, the District Court applied the wrong standard to preclude its evidence under Rule 37.[3] Specifically, Design asserts that, before a court may preclude evidence as a discovery sanction, it must find "bad faith and callous disregard of the Federal Rules." See DiPirro v. United States, 43 F.Supp.2d 327, 340 (W.D.N.Y.1999) ("Precluding expert testimony under [Rule 37(c)(1)] is a drastic remedy and should only be applied in cases where the party's conduct represents flagrant bad faith and callous disregard for the requirements of Rule 26(a)(2)(B)."). As noted above, the District Court decided there was no such requirement and observed that this Court had not yet passed on this issue. See Hein v. Cuprum, S.A., de C.V., 53 Fed.Appx. 134, 137 (2d Cir. 2002) ("We express no opinion as to whether a showing of bad faith is required before evidence may be excluded under Rule 37(c)(1)."). Since Rule 37(c)(1) by its terms does not require a showing of bad faith, we now hold that such a requirement should not be read into the Rule.
 
 
 60
 In determining whether the District Court abused its discretion in imposing the sanction under Rule 37, we are governed by the standard set forth in Patterson v. Balsamico, 440 F.3d 104 (2d Cir.2006). In Patterson, two defendants violated Rule 26(a)(3) by not timely disclosing the names of witnesses they planned to call at trial. Id. at 117. The District Court granted the plaintiff's motion to preclude, except as to one witness who was named in the original complaint and whose testimony reasonably could have been anticipated. Id. On appeal to this Court, we held that "[i]n determining whether the district court acted within its discretion, this Court [must] consider[] `(1) the party's explanation for the failure to comply with the [disclosure requirement]; (2) the importance of the testimony of the precluded witness[es]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance.'" Id. (citing Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc., 118 F.3d 955, 961 (2d Cir.1997)) (brackets in Patterson). Thus, although a "bad-faith" violation of the Rule 26 is not required in order to exclude evidence pursuant to Rule 37, it can be taken into account as part of the party's explanation for its failure to comply.
 
 
 61
 Applying Patterson to this case, we cannot say that the District Court abused its discretion when it determined that the sanction imposed was warranted under Rule 37. Although the second Patterson factor favors Design because Design's evidence of lost profits was essential to proving these damages, all of the other factors weigh heavily in favor of exclusion. Design has not yet explained why it omitted "lost profits" as a category of damages in its Initial Disclosure.[4] The prejudice to the defendants in having to prepare for this evidence would have been severe, as discovery would have had to be reopened to determine whether Design's calculations were proper. The "expert" witness that Design wanted to call also would have had to (a) prepare a report; and (b) be qualified as an expert with regard to the calculation of damages. Finally, weighing heavily on both the prejudice and possibility of continuance factors was the fact that discovery had been closed for "approximately one and a half years," and at the time of the offer of expert testimony there was only a "short time left before trial." On the facts before us, the District Court did not abuse its discretion in determining that sanctions, including severe sanctions, were warranted for Design's failure to abide by Rule 26(a)(1)(c).
 
 
 62
 The District Court did, however, err in its determination that "preclusion is mandatory" under Rule 37(c)(1) once "the trial court finds that there is no substantial justification and the failure to disclose is not harmless." The language in two cases from our sister circuits is in conformity with this viewpoint: Finley v. Marathon Oil Co., 75 F.3d 1225 (7th Cir.1996), and Wilson v. Bradlees of New England, Inc., 250 F.3d 10 (1st Cir.2001). In Finley, the plaintiffs failed to disclose "expert testimony intended for use as rebuttal evidence" to the defendants "within 30 days of the [defendant's] disclosure of his expert testimony" in violation of Fed.R.Civ.P. 26(a)(2)(c) — indeed, the plaintiffs "missed the deadline [for disclosure] by months." Id. at 1230. The Seventh Circuit held that the district court in that case had not "abused his discretion in refusing to permit the introduction" of this evidence. Id. The Seventh Circuit reasoned that
 
 
 63
 Rule 37(c)(1) provides that "a party that without substantial justification fails to disclose information required by Rule 26(a) . . . shall not, unless such failure is harmless, be permitted to use as evidence at a trial . . . any . . . information not so disclosed" (emphasis added). The sanction of exclusion is thus automatic and mandatory unless the party to be sanctioned can show that its violation of Rule 26(a) was either justified or harmless.
 
 
 64
 Id. (alterations in original).
 
 
 65
 In Wilson, the plaintiffs disclosed two videotapes, prepared by expert witnesses, reenacting the injury-causing accident at issue in that case. Wilson, 250 F.3d at 18-19. These disclosures occurred months after the close of discovery. Id. In affirming the district court's exclusion of those two videotapes from evidence the First Circuit called Rule 37(c)(1)'s preclusion sanction "near automatic." Wilson, 250 F.3d at 20 (emphasis added). The First Circuit explained that
 
 
 66
 it is the obligation of the party facing sanctions for belated disclosure to show that its failure to comply with the Rule was either justified or harmless and therefore deserving of some lesser sanction. This is a burden that plaintiff made no attempt to shoulder, and the district court did not abuse its discretion in imposing Rule 37(c)(1)'s `self-executing' sanction.
 
 
 67
 Id. at 21 (internal citations omitted).
 
 
 68
 Both Finley and Wilson find some support in the 1993 Advisory Committee Notes accompanying Rule 37, which refers to Rule 37(c)(1) as an "automatic" sanction:
 
 
 69
 Paragraph (1) prevents a party from using as evidence any witnesses or information that, without substantial justification, has not been disclosed as required by Rules 26(a) and 26(e)(1). This automatic sanction provides a strong inducement for disclosure of material that the disclosing party would expect to use as evidence . . . .
 
 
 70
 Fed.R.Civ.P. 37 Advisory Committee Notes to 1993 Amendments (emphasis added). To the extent that the Advisory Committee Note calls Rule 37(c)'s exclusion of evidence "automatic," however, that characterization cannot be squared with the plain language of Rule 37(c)(1) itself. Rule 37(c)(1) itself recognizes that "[i]n addition to or in lieu of this [preclusion] sanction, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions." Thus, the plain text of the rule provides that if an appropriate motion is made and a hearing has been held, the court does have discretion to impose other, less drastic, sanctions.
 
 
 71
 In another part of its Order, the District Court did recognize this discretion when it precluded another Design expert, John Doughty, from testifying about the nature of the solutions and staffing business:
 
 
 72
 Given that Defendants have moved to preclude Doughty's testimony and that the [c]ourt held a telephone conference on this matter, it is not necessary to invoke Rule 37(c)(1)'s automatic sanction in order to preclude Doughty's testimony. Rather, Rule 37(c)(1) provides that "[i]n addition to or in lieu of [the automatic sanction], the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions." The Court precludes Doughty's testimony in an exercise of this discretion.
 
 
 73
 This is a correct statement of the Rule and of the court's discretion in applying it.
 
 
 74
 In prior cases in which a district court erroneously imposed a sanction against a party, this Court has indicated a preference for remanding the case to the district court to reconsider whether to sanction, and, if so, the appropriate sanction. See, e.g., Simon DeBartolo Group, L.P. v. Richard E. Jacobs Group, Inc., 186 F.3d 157, 177 (2d Cir.1999) (stating, in case involving sanctions pursuant to Fed. R.Civ.P. 11, that "were this an ordinary case, we would likely remand it to the district court for a determination as to whether it will persist in its decision to impose sanctions at all, and only if so for a determination of what those reconsidered sanctions should be"); Hernandez v. Conriv Realty Assocs., 116 F.3d 35, 41 (2d Cir.1997) (concluding, in case involving sanctions pursuant to Fed.R.Civ.P. 16(f), that district court "should reconsider whether to impose sanctions" and that "[i]f the court decides to impose sanctions, the court should also reconsider what sanctions are appropriate"). Here, however, remand is inappropriate because Design has not, to this day, presented any evidence of lost profits. As when a district court abuses its discretion by erroneously excluding evidence under the Federal Rules of Evidence, we look to whether this exclusion was likely to have affected the outcome of the case. See Fed.R.Evid. 103(a); Phoenix Associates III v. Stone, 60 F.3d 95, 104-05 (2d Cir.1995). As late as oral argument before this Court, Design has persisted in characterizing its bare financial statements and the "simple arithmetic" of figuring its overall profit margin as adequate evidence of its lost profits. For the reasons discussed above, that evidence is insufficient to prove lost profits in this case and therefore the exclusion of that evidence cannot have prejudiced Design nor have affected the outcome of the case.
 
 II. Denial of a Jury Trial
 
 75
 By Order dated February 16, 2005, the District Court found that "Design [was] not . . . entitled to a trial by jury on any claims with respect to which it seeks only the equitable remedies of disgorgement of profits, restitution, the imposition of a trust, an accounting, exemplary damages, or a permanent injunction." Design argues that even if this Court affirms the judgment of the District Court incorporating its decision to preclude evidence, and therefore a claim, of lost profits, that its "other causes of action not related to the lost profits claim" entitled it to a jury trial.
 
 
 76
 "We review de novo a district court's decision to deny a jury trial." Pereira v. Farace, 413 F.3d 330, 337 (2d Cir. 2005).[5] As this Court recently reaffirmed, only those claims that can be classified as "suits at common law" trigger the right to a jury trial. See id. (citing U.S. Const. amend. VII.).
 
 
 77
 In deciding whether a particular action is a suit at law that triggers this important protection, we are instructed to apply the two-step test set forth in Granfinanciera[, S.A. v. Nordberg, 492 U.S. 33, 42, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989)]. First, we ask whether the action would have been deemed legal or equitable in 18th century England. Second, we examine the remedy sought and determine whether it is legal or equitable in nature.
 
 
 78
 Id. (internal citations and quotation marks omitted).
 
 
 79
 Although the District Court initially found that Design's remaining claims were arguably "legal" because they "may be construed as contractually grounded" in an implied contract for employment, it ultimately determined that the remedies sought by Design, save the lost profits that the District Court had precluded evidence of, were all equitable. Specifically, the District Court determined that "[t]here does not appear to be any significant argument that Design's claims for an injunction, punitive damages, or attorneys' fees and costs" were anything but "equitable." The District Court further determined the claims for "constructive trust" and restitution were also equitable, reasoning that "these remedies do not aim to compensate Design for damages it suffered in the form of monetary gains it would have earned . . . [but][r]ather, the relief demanded seeks to remove from Defendants the funds that they allegedly obtained unjustly and that in good conscience should be turned over to Design."
 
 
 80
 Design's arguments as to why the District Court erred in so finding are all variations on the same theme — its claims were designed to obtain "compensat[ion]." Design does not put forward, nor analyze, the holding of Granfinanciera, as did the District Court. Moreover, Design does not address at all the District Court's central proposition that the remedies sought here could not be deemed "compensatory" in the strict sense.
 
 
 81
 An examination of Design's Initial Disclosure demonstrates that the District Court correctly found that all of Design's claimed remedies were equitable. The Initial Disclosure stated: 1. All monies paid to Marc Davis for salaries based upon breach of fiduciary relationship with Plaintiff.
 
 
 82
 2. All monies earned by Marc Davis as a result of unlawful diversion of business from Design Strategy to the corporate Defendants.
 
 
 83
 3. All profits earned by the Defendants as a result of the unlawful diversion of business from the Plaintiff to the Defendants, which business was generated with Microsoft Corporation.
 
 
 84
 4. Attorneys' fees for the prosecution of this action.
 
 
 85
 5. Punitive damages.
 
 
 86
 6. Interest costs and disbursements.
 
 
 87
 As found by the District Court, none of these categories is "damages" in the strict sense of remedying "loss" to Design. Rather, all these categories seek monies unjustly earned by Davis and the IT Defendants or monies expended during litigation — none of these categories has any connection to Design's actual loss. See Dan B. Dobbs, Law of Remedies, § 2.6(3) (2d ed. 1993) ("Some money claims are not `damages' representing the plaintiff's loss but `restitution' representing the defendant's unjust gains in a transaction.").
 
 
 88
 At oral argument the issue of whether a claim for punitive damages independently entitles a plaintiff to a jury trial under the Seventh Amendment was raised for the first time in this case. This issue, however, was not argued, nor even mentioned, in the brief. "Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal." Norton v. Sam's Club, 145 F.3d 114, 117 (2d Cir.1998). We therefore do not address this issue in this case.
 
 III. Decisions Following Trial
 
 89
 Having determined that the District Court did not commit reversible error in striking any claim by Design for lost profits and that the District Court did not err in finding that Design was not entitled to a jury trial on its remaining claims, we next examine Design's challenges to the District Court's findings of fact and conclusions of law following the bench trial. "Following a bench trial, we set aside findings of fact only when they are clearly erroneous, and we give due regard to the trial court's credibility determinations. However, we review de novo the district court's conclusions of law and its resolution of mixed questions of law and fact." Phansalkar v. Andersen Weinroth & Co., L.P., 344 F.3d 184, 199 (2d Cir.2003).
 
 
 90
 A. Finding of and Remedy for Employee Disloyalty
 
 
 91
 The District Court determined that Davis had violated his fiduciary duty of loyalty to Design in promoting IT Web for the Contentville project and that the proper remedy for this breach was the forfeiture of salary, but not commissions, earned during the period of disloyalty. This Court has observed that:
 
 
 92
 New York law with respect to disloyal or faithless performance of employment duties is grounded in the law of agency, and has developed for well over a century. . . .
 
 
 93
 Under New York law, an agent is obligated to be loyal to his employer and is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties. One who owes a duty of fidelity to a principal and who is faithless in the performance of his services is generally disentitled to recover his compensation, whether commissions or salary. Moreover, a principal is entitled to recover from his unfaithful agent any commission paid by the principal. It does not make any difference that the services were beneficial to the principal, or that the principal suffered no provable damage as a result of the breach of fidelity by the agent.
 
 
 94
 Phansalkar, 344 F.3d at 200 (internal quotation marks and citations omitted). Davis does not argue that he was not disloyal nor that some forfeiture of income was appropriate. Thus, the only question presented here is Design's contention that the District Court erred in determining the remedy.
 
 
 95
 This Court recognized in Phansalkar that "New York's lower courts have endorsed limiting forfeiture to compensation paid during the time period of disloyalty." Id. at 205. Despite this clear statement of law, Design insists it is entitled to forfeiture of all salaries and commissions earned by Davis over his thirteen-year career at Design. Design cites no authority for this proposition,[6] and this Court rejects it.
 
 
 96
 Design also argues that Davis should be forced to forfeit the commissions he earned during the period of disloyalty. In Phansalkar, this Court held that a disloyal employee was to forfeit all salary earned during the period of his disloyalty. Id. at 207-08. In doing so, this Court expressly distinguished a prior case, Musico v. Champion Credit Corp., 764 F.2d 102 (2d Cir.1985), which had instead permitted a "transaction-by-transaction forfeiture." Phansalkar, 344 F.3d at 207. This Court explained that such a limitation of forfeitures was permitted only where:
 
 
 97
 (1) the parties had agreed that the agent will be paid on a task-by-task basis (e.g., a commission on each sale arranged by the agent), (2) the agent engaged in no misconduct at all with respect to certain tasks, and (3) the agent's disloyalty with respect to other tasks "neither tainted nor interfered with the completion of" the tasks as to which the agent was loyal.
 
 
 98
 Phansalkar, 344 F.3d at 205 (citing Musico, 764 F.2d at 114). Thus, this Court distinguished forfeiture in cases involving an employee who drew a regular salary from cases in which an employee drew a commission.
 
 
 99
 As the District Court found,
 
 
 100
 [t]he instant case presents a hybrid of Musico and Phansalkar in that Davis received both general compensation (his salary) and commissions, or specific amounts paid for individual tasks completed (in this case, sales of staffing services to Design clients). Applying the forfeiture methods used in both of those cases, the Court finds that Davis must forfeit the salary that he received during the period of disloyalty, but that he is not required to forfeit any commissions because, unlike the defendant in Phansalkar, Davis's disloyalty did not arise in connection with any Design transaction from which he was entitled under the terms of his employment agreement to receive a commission, nor did it "taint[] or interfere[] with the completion" of any sales in relation to which he received a commission. [Phansalkar, 344 F.3d] at 205 (quoting Musico, 764 F.2d at 114).
 
 
 101
 We adopt the District Court's application of our precedents to this case. The District Court did not err in determining that Davis should forfeit salary for the disloyal period but not any commissions earned.
 
 
 102
 Finally, Design challenges the facts found by the District Court in relation to the duration of Davis's disloyalty for the purposes of forfeiture and the "outrageous[ness]" of Davis's conduct for the purposes of punitive damages. Examining these challenges in reverse order, the District Court did not err in finding that "[a]lthough Davis's disloyal actions were knowing and reflected a prioritization of self-interested ends over his duty of loyalty to his employer," there was "no evidence in the record to support a finding of the level of extreme moral culpability necessary for an award of punitive damages." The District Court reasonably based this conclusion on its finding
 
 
 103
 that Davis initially sought to procure the Contentville project solutions work for Design, that he informed Newmark about the opportunity and Newmark apparently was at best ambiguous about making the necessary initial capital investment, and that it was not until much later, when Davis believed that Design was not prepared to pursue the Contentville business under the terms established by Microsoft, that Davis turned to IT Web.
 
 
 104
 The District Court's factual findings are not clearly erroneous, nor can it be said, based on those findings, that the District Court abused its discretion in finding that those facts did not rise to "gross, wanton, or willful fraud or other morally culpable conduct." See Action S.A. v. Marc Rich & Co., Inc., 951 F.2d 504, 509 (2d Cir.1991) (setting forth standard for punitive damages in New York); Whitney v. Citibank, N.A., 782 F.2d 1106, 1118-19 (2d Cir.1986) (holding that this Court reviews award of punitive damages for abuse of discretion).
 
 
 105
 With respect to the duration of Davis's disloyalty, the District Court required Davis to pay damages in the amount of his salary between November 11, 1999, and December 9, 1999. Although Design asserts that the period of Davis's disloyalty spanned from at least September 22, 1999, when he first interviewed for a position with the IT Defendants, through March 2000, after he had accepted that position but remained on Design's "payroll," the Record supports the District Court's determination that
 
 
 106
 Davis was promoting Design in discussions with Murphy until sometime in November 1999, that IT Web had effectively been awarded the Contentville contract by mid-December 1999, and that most of the allegations concerning Davis's disloyalty entailing his advocacy on behalf of IT Web point to events that occurred in mid- to late November and not later than early December 1999.
 
 
 107
 Moreover, Design's contention that Davis was on its payroll in March 2000 does not make clear whether Davis merely continued to receive commission checks after he left Design in February 2000 or whether he was still drawing a salary. Design does not further develop this point or refer to any supporting evidence in the Record.[7] Accordingly, we find no error in the damages award.
 
 
 108
 B. Finding of Non-complicity by Competitor-IT Defendants
 
 
 109
 Under New York law,
 
 
 110
 [a] plaintiff seeking to establish a cause of action for aiding and abetting a breach of fiduciary duty must show: "(1) the existence of a . . . violation by the primary (as opposed to the aiding and abetting) party; (2) `knowledge' of this violation on the part of the aider and abettor; and (3) `substantial assistance' by the aider and abettor in the achievement of the primary violation."
 
 
 111
 Samuel M. Feinberg Testamentary Trust v. Carter, 652 F.Supp. 1066, 1082 (S.D.N.Y. 1987) (quoting IIT v. Cornfeld, 619 F.2d 909, 922 (2d Cir.1980)). Design challenges the District Court's finding that "there is insufficient evidence in the record . . . to establish the second or third elements." As noted above, this Court reviews that determination for clear error as to the facts and reviews de novo the District Court's conclusions of law.
 
 
 112
 Design argues that the IT Defendants were complicit because they knew that Davis was employed by Design at the time he interviewed with them and later promoted IT Web for the Contentville contract and that Contentville went to IT Web largely because of Davis. However, the District Court found that the IT Defendants did not know, or have any reason to know, that Davis was breaching his duty of loyalty when he acted. As the District Court explained,
 
 
 113
 In this case, although the IT Defendants clearly had knowledge that Davis had alerted them to the possibility of a software solutions business opportunity with Microsoft, there is no basis on which to conclude that they had actual knowledge that Davis's behavior in so alerting them was disloyal to Design. In order to have such knowledge, the IT Defendants would have to have known, among other things, that Davis had not informed Newmark about his promoting IT Web for the Contentville business, and that Newmark had not consented to Davis's informing them of such an opportunity. In general terms, Goullet, [the President of IT Web, and the Executive Vice-President of Infotech] all testified that at their first interview with Davis on September 22, 1999, he told them that one of his reasons for seeking to leave Design was that Newmark was not interested in expanding Design into the web solutions business that Davis wanted to pursue.
 
 
 114
 More specifically, Goullet testified that he knew that Davis had originally tried to solicit a business opportunity with Microsoft on behalf of Design. Design's counsel asked Goullet if he "ever [said] anything to Mr. Davis, you may have a conflict of interest with what you are giving me, or information you are transmitting to me, about this opportunity at Microsoft; you better check with your boss and see if it's okay." Goullet replied that he and Davis had "discussed this" and that he thought he "asked [Davis] if he had brought it to Marsh [Newmark] and to Design Strategy" and that Davis had told him he had. When asked if he "ever ask[ed] [Davis] if he had talked to Mr. Newmark about giving [Goullet] the information with regard to the Contentville contract," however, Goullet replied that he had not spoken to Davis about this. Under these circumstances Goullet had no reason to question Davis's statements. He reasonably could have concluded that Design was not interested in or qualified to pursue the Contentville business. He was not under any independent affirmative duty to call Design to verify what Davis had represented.
 
 
 115
 (internal citations omitted). In light of the District Court's other findings regarding Davis having initially notified Design and Newmark about Contentville, and Newmark's reaction to the Contentville opportunity, this Court cannot say that these findings of fact are clearly erroneous. Design also argues that Davis's compensation at IT Web was in an amount that compels the conclusion that he was paid to bring the Contentville project to IT Web. Again, the District Court squarely addressed and rejected this contention. Design's objection that Goullet's testimony was "incredible as a matter of law" notwithstanding, the District Court did not commit clear error in finding that the IT Defendants did not aid and abet Davis's breach of fiduciary duty.
 
 C. Rejection of Overpaid Commissions Claim
 
 116
 Apparently, at some point after Davis left Design, Design was obligated to provide a discount on services already rendered to Merrill Lynch. Davis had serviced, and earned commissions from, that Merrill Lynch account. Design thereafter sent a letter to Davis, demanding the return of approximately $41,000 in commissions that he allegedly owed due to the discount.
 
 
 117
 It is undisputed that Design did not list this claim in its Complaint nor in its Initial Disclosure. Design first indicated that it intended to seek to recover commissions in its February 15, 2005, draft pre-trial order. Davis moved for an order precluding Design from offering any evidence on its overpaid commissions claim as part of the same motion in limine in which defendants moved to preclude evidence of Design's lost profits and on the same grounds— Design had not asserted the overpaid commissions claim in its Complaint or in its Initial Disclosures, and no discovery had been conducted as to that claim. The District Court denied Davis's motion in part by Order dated April 27, 2005, concluding that it would allow Design's proposed witness, Joel Redesky, to offer "factual testimony" concerning the alleged overpayment of commissions to Davis "to the extent there has been discovery concerning those commissions."
 
 
 118
 At the bench trial, Design presented evidence and testimony, but not from Redesky, concerning these commissions. Near the conclusion of its findings of fact and law, the District Court stated
 
 
 119
 Design argued at trial that Davis was "overpaid commissions on Merrill Lynch work undertaken by Design." Design did not plead this claim in its complaint or include it in its initial disclosures, nor has it offered any legal theory on the basis of which the Court could sustain such a claim. Accordingly, Design's claim for overpaid commissions is dismissed.
 
 
 120
 (internal citation omitted). It thus appears that the District Court rejected this claim on two grounds, one procedural, one on the merits.
 
 
 121
 The District Court erred in rejecting this claim on procedural grounds, inasmuch as its prior order of April 27, 2005, permitted this claim to go to trial. However, Design's claim fails on the merits. Under New York law, "[i]n the absence of a special agreement, an employer may not recover back wages or equivalent drawings paid during a period of completed employment." Kleinfeld v. Roburn Agencies, Inc., 270 A.D. 509, 60 N.Y.S.2d 485, 487 (1946). This rule applies even to "unearned commissions." Centerbank Mortgage Co. v. Shapiro, 237 A.D.2d 477, 655 N.Y.S.2d 596, 597 (N.Y.App.Div.1997).
 
 
 122
 Design does not point to any "special agreement" to permit the recovery of these allegedly excess commissions. Although Design asserts that "[t]he practice of adjustment of overpaid commissions at Design was known to Davis and was contained within Design's commission plan," Design points to no such agreement in the Record, nor does it address Davis's invocation of the relevant New York law. Accordingly, we find that the District Court's dismissal of this claim was proper.
 
 CONCLUSION
 
 123
 For the foregoing reasons, the judgment of the District Court is affirmed.
 
 
 
 Notes:
 
 
 [1]
 The Honorable Richard J. Holwell of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [2]
 The District Court also rejected a counterclaim by Davis against Design that has no relevance to the instant appeal
 
 
 [3]
 Rule 37(c)(1) of the Federal Rules of Evidence provides that
 [a] party that without substantial justification fails to disclose information required by Rule 26(a) ... is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed. In addition to or in lieu of this sanction, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions.
 
 
 [4]
 Nor does the Record reflect that Design ever updated its disclosures as required by Rule 26(e). That this category of damages was never claimed further explains why there were never "direct order[s]" to calculate those damages
 
 
 [5]
 The opinion inPereira was issued after the District Court's decision in this case.
 
 
 [6]
 Design does citePhansalkar, 344 F.3d at 202, in support, but that citation is to Phansalkar's recitation of the historical rule of salary forfeiture, a rule that Phansalkar specifically noted had been abandoned, id. at 205.
 
 
 [7]
 Design makes a further argument that is wholly without merit. Design asserts that Davis was disloyal byinterviewing with IT Web while still at Design because these interviews were "not done on a casual basis," were "during business hours and on Design's time," and because Davis used a cell phone and vehicle provided by Design in relation to these interviews. These are not the kind of actions the "disloyal servant" doctrine was meant to deter.